**VICKERS PETROLEUM CO., Inc., Appellant,**

v.

**Ned BIFFLE, sole owner, doing business as Ned Biffle Drilling Company, Appellee.**

**No. 5444.**

United States Court of Appeals Tenth Circuit.

Dec. 10, 1956.

Coleman Hayes, Oklahoma City, Okl. (George Stallwitz, Wichita, Kan., on the brief), for appellant.

Luther Bohanon, Oklahoma City, Okl. (Bert Barefoot, Jr., Oklahoma City, Okl., on the brief), for appellee.

Before BRATTON, Chief Judge, and HUXMAN and PICKETT, Circuit Judges.

HUXMAN, Circuit Judge.

This was an action in which appellee Ned Biffle sought damages from appellant

Vickers Petroleum Company, Inc., herein referred to as Vickers, for breach of contract. The factual situation out of which this litigation arose is as follows. Vickers was the owner of oil and gas leases covering an undivided 7/8 interest of the mineral interest under the North One-half of the Southwest Quarter of the Northeast Quarter of Section 27, Township 3 North, Range 2 West. The remaining 1/8 of the mineral interest thereunder was owned by Biffle. The lease which Vickers owned on this mineral interest would expire in the absence of the commencement of drilling operations on or before January 24, 1953. Biffle was the record owner of an oil and gas lease on the South Half of the Southwest Quarter of the Northeast Quarter of Section 27. It was orally agreed between Vickers and Biffle that the parties would communitize the two tracts and would drill one well so that if it became necessary the 40 acre tract could be operated as a unit. It was orally agreed that Biffle who had a string of drilling tools was to drill the well to a stated depth at a stated price per foot, not in dispute, and that Vickers was to be the operator of the communitized acreage if production resulted. It was also understood by the parties that the oral agreement was to be reduced to writing. In order to secure an extension of the Vickers Lease expiring January 24, 1953, it was necessary to move the rig on the premises and to begin drilling operations on or before February 15, 1953. Biffle moved onto the location selected on the North Half of the tract by that date and began drilling operations. All this was done before the oral agreement providing for the drilling of the well and the payment of the costs thereof could be reduced to writing. When the oral contract was reduced to writing by an attorney selected by the parties, it provided that Vickers should pay 7/16 of the drilling costs and Biffle 9/16 thereof. Biffle refused to sign this agreement claiming that it violated the oral agreement, under which he was to pay but 1/16 of the drilling costs.

The difficulty between the parties with respect to the payment of drilling costs arose because of the real ownership of the lease to the South 20 acres of the tract which of record stood in Biffle's name. Biffle apparently had made an assignment of all his interest to this lease to Tom Grimmett which was not placed of record and under the terms of which under certain conditions the interest or a part thereof in the lease might reinvest in Biffle.

In his complaint, Biffle alleged that he was the owner of an undivided 1/16 interest in the 40 acre tract; that it was orally agreed that he should bear 1/16 of the drilling costs; and that Vickers should be responsible for the remaining 15/16 thereof. He alleged a breach of the oral contract by Vickers' refusal to have the terms thereof incorporated into the written contract. In his complaint, he alleged that he had expended $15,337.04 in drilling operations and that a reasonable profit from the performance of the drilling contract would have been $22,000. He prayed judgment for $37,338.04.

Trial was had to the Court. It found as a fact that the oral agreement was that Biffle "would stand five-sixteenths (5/16) of all costs of drilling, equipping, and operations" and that Vickers "was to stand eleven-sixteenths (11/16) of all such cost" with the right of a lien by Vickers on the production of any other leasehold interest holder.

As stated, the difficulty comes about by virtue of the unrecorded assignment from Biffle to Grimmett of the lease to the South 20 acres of the tract. Notwithstanding Biffle's allegation that he had assigned the entire lease to the South 20 acres of the tract to Grimmett and had no interest therein, it seems to be without doubt that he had a continuing interest in that lease and therefore had a greater interest in the 40 acre tract than the 1/16 interest set out in his complaint. It seems to be without dispute that Vickers' entire interest in the 40 acre tract was a 7/16 interest. The Court's

finding that the oral agreement was that Biffle would stand ⅚₆ of all costs is tantamount to a finding that this was his interest in the 40 acre tract. From this it follows that Grimmett would have a ⁴⁄₁₆ interest in the 40 acre tract. The decision turns upon whether the minds of the parties met on an oral agreement, as found by the Court, that Biffle was to stand ⅚₆ of the drilling costs and in effect finding that Vickers should stand ⁷⁄₁₆ of the costs, because of its ownership of such interest, and should be responsible for the ⁴⁄₁₆ of the costs attributable to Grimmett's interest, and have a lien on his interest in any production which might be found, rather than that the agreement was as alleged by Biffle in his complaint that he was to stand only ⅟₁₆ of such costs.

There was some confusion in the testimony as to any interest Biffle might have in the South 20 acres of the tract after the assignment to Grimmett. There is no direct testimony by Biffle that he retained any present interest. At the conclusion of the trial, the Court announced that it would permit a reformation of the pleadings to conform to the facts. No formal amendment was made. Apparently the Court considered the complaint amended to allege an oral contract between Vickers and Biffle, in which it was agreed that Biffle would be charged with ⅚₆ of the costs; that Vickers would be charged with ⁷⁄₁₆ of the costs because of its ownership of that interest, and would be required to advance ⁴⁄₁₆ of the costs attributable to Grimmett's interest, and then have a lien on his share of any production for repayment of such costs.

We think the record is barren of any facts to support a finding that such was the oral agreement of the parties. Neither Biffle nor Vickers testified that such was their agreement. Biffle testified positively a number of times that he owned a ⅟₁₆ interest in the 40 acre

tract and that he was chargeable for ⅟₁₆ of the development costs. At other times, he gave testimony indicating that Grimmett had some interest in the South 20 acres and that he had the remaining interest therein. He testified that in a conversation with Mr. Sinclair, representing Vickers, he stated that he was willing to drill a well "but that J. Tom Grimmett * * * would own a one-half interest in the South Half * * * and that I would have to consult with him in the matter"; that he told Mr. Sinclair that "* * * Tom Grimmett would have to be taken into consideration in the South 20 acres" and that "if Grimmett's 20 acres down there was going to be part of the well, that he [Sinclair] would have to consult with him and he should make arrangements how Grimmett was going to pay him because he had had some financial troubles and I just warned him that Grimmett was not hardly able to pay his bills and he ought to make his arrangements first." In a deposition, he testified that Vickers would initially pay the contractor. In response to the following question "Q. Now, then, did you and Tom Sinclair talk about who was going to pay for this well or how it was to be paid, or did you just depend upon the custom of the business?", he answered, "A. Nothing other than they said they wanted to be the operators of it and was going to get the operating agreement prepared and the drilling contract prepared, and I guess you might say *I assumed that they were going to pay all the bills and then bill each other because I never heard of any other deal contrary to that in the oil business.*"[1] Admittedly Biffle talked to Grimmett about the deal but Vickers never did.

■■ From this outline of the evidence, the conclusion is inescapable that the minds of the parties never met as to how Grimmett's share of the development costs was to be paid. Therefore,

---

1. Emphasis supplied.

no enforceable contract was ever reached. This being so, there could be no breach and the judgment of the Court cannot stand. Included in the judgment of the Court is an item of $500 per day for 23 days, stand-by or shut-down time. The drilling contract provided for such damages for stand-by time, while the driller was awaiting drilling orders from the operator. But to entitle the driller to shut-down time there must have been an enforceable contract and a breach thereof by the operator. Here the idle time of 23 days was occasioned because of the inability of the parties to agree with respect to the payment of the costs of drilling the well. Biffle was not prevented from continuing drilling operations because of a breach of duty owed by Vickers under an enforceable contract. He is therefore not entitled to compensation for stand-by or shut-down time.

What has been just said applies with equal force to the item of $20,000 as loss of profits because of the breach of the oral contract by Vickers. Eliminating these two items leaves $4,860.58. This sum evidently represents the amount actually expended by Biffle in the preliminary drilling operations incurred before the parties reached an impasse and failed to agree on the terms of the oral contract.

As pointed out, it was necessary to move in the rig and begin drilling operations before the parties had come to an agreement, in order to get an extension of the lease to the North 20 acres. The extension of this lease was essential to the common enterprise which the parties were attempting to work out. In addition, it tended to promote Biffle's ⅛ interest in the North 20 as well as Vickers' ⅞ interest therein. If successful in the enterprise, it would also be beneficial to Biffle's ⁴⁄₁₆ interest in the South 20 acres which the Court found

he held therein. This then is the situation. We have two parties who have a common interest in the North 20 acres. In addition, they were contemplating an agreement which would combine that acreage with the South 20 in the nature of a joint venture, which would give Vickers an interest in the South 20 acres, and thus tend to promote their common interest in the entire tract. In attempting to work out this arrangement, they incurred preliminary expenses of $4,-860.58. Under the principle of contribution these expenses were attributable to both Vickers and Biffle and should be borne in proportion to their interest in the combined tract. Contribution is an equitable doctrine based on principles of fundamental justice.[2] It arises " * * when any burden ought, from the relationship of the parties * * * to be equally borne and each party is in aequali jure, contribution is due if one has been compelled to pay more than his share."[3] "The right to contribution is not dependent on contract, joint action, or original relationship between the parties; it is based on principles of fundamental justice and equity."[4] We think Vickers and Biffle should each bear that portion of the $4,860.58 represented by their interest in the combined acreage, viz., Vickers ⁷⁄₁₆ and Biffle ⁵⁄₁₆. That leaves undisposed of the costs attributable to Grimmett's interest in the acreage, which the Court found to be ⁴⁄₁₆. Obviously Grimmett cannot be charged with any costs because he was not consulted and was not a party to the proposed agreement. With respect to this item of costs, we think Vickers should pay ⁷⁄₁₂ and Biffle ⁵⁄₁₂ thereof. Mathematically computed, that entitled Biffle to a judgment of $2,-835.34. The judgment is therefore modified and reduced to $2,835.34 and as so modified it is affirmed. Costs are charged equally to both parties to the appeal.

2. Worthington v. Keely, 64 Colo. 91, 170 P. 194.

3. 13 Am.Jur., Pages 6–7, § 3, Contribution.

4. 13 Am.Jur., Supra, § 6.