691 F.2d 15
 In re N-500L CASES.
Cornhill Insurance Company Ltd.,
and
Corporacion Insular De Seguros, Defendants-Third Party
Defendants-Appellants.
Eastern Airlines, Inc., Defendant-Third Party
Plaintiff-Cross Claimant- Appellee.
United States of America, Defendant-Appellee.
 No. 81-1446.
 United States Court of Appeals,
First Circuit.
 Argued June 2, 1982.
Decided Sept. 28, 1982.
 
 John M. Harrington, Jr., with whom Kenneth W. Erickson, Thomas H. Hannigan, Jr., Ropes & Gray, Boston, Mass., Francisco Agrait Oliveras, and Agrait & Oliveras, Hato Rey, P. R., were on brief, for defendants-third party defendants appellants.
 Carolyn A. Pickard, with whom Richard J. Thornton, Calvin F. David, and Thornton, David & Murray, P. A., Miami, Fla., were on brief, for Eastern Airlines, Inc., defendant-third party plaintiff-cross claimant-appellee.
 Phillip J. Kolczynski, Aviation Trial Atty., Torts Branch, Civil Division, United States Dept. of Justice, Washington, D. C., with whom J. Paul McGrath, Asst. Atty. Gen., Washington, D. C., and William F. Weld, U. S. Atty., Boston, were on brief for the United States of America, defendant-appellee.
 Before CAMPBELL and BOWNES, Circuit Judges and PETTINE,* District Judge.
 BOWNES, Circuit Judge.
 
 
 1
 This case arises out of a 1978 crash in San Juan, Puerto Rico. A twin-propeller aircraft, bearing the identification number N-500L (N-500L), was on approach for landing at San Juan International Airport when it was overtaken by an Eastern Airlines L-1011 jumbo jet (L-1011) which was also in the process of landing. It was stipulated that wake turbulence generated by the L-1011 caused the N-500L to crash, killing all six persons aboard and causing substantial injury to persons and property on the ground.
 
 
 2
 In all, twenty-six tort actions and several third-party claims for contribution[1] were filed and thereafter consolidated. The defendants were Eastern Airlines (Eastern); Federal Aviation Administration air traffic controllers (Government); Air Caribbean, operator of the N-500L; Francisco Cruz, owner of the N-500L; Cornhill Insurance Company Ltd., representing underwriters in the London market and liability insurers for Air Caribbean (Cornhill); and Corporacion Insular De Seguros, liability insurer for Cruz (Corporacion).[2]
 
 
 3
 Plaintiffs had requested a jury trial in all cases.[3] On the eve of trial, after settlement negotiations with the plaintiffs, Eastern and Government agreed to assume all liability, reserving their rights to seek contribution from N-500L, Air Caribbean, Cornhill and Corporacion. Eastern and the Government agreed on a settlement of $5,690,000 with the plaintiffs and an order of settlement was entered by the court in that amount. Cornhill and Corporacion, although agreeing not to dispute the reasonableness of the amount, did not admit liability or participate in the settlement negotiations.
 
 
 4
 Eastern and the Government then moved for a nonjury trial on their contribution claims. Cornhill and Corporacion objected, claiming that they had justifiably relied on the original plaintiffs' jury demands.[4] In a written decision the district court granted the motion and ordered a nonjury trial on the proportionate liability of N-500L, the Government and Eastern, holding that appellants had waived their rights to a jury trial. In re N-500L Cases, 517 F.Supp. 821 (D.P.R.1981).
 
 
 5
 After a fourteen-day trial, the district court found that the pilot of N-500L was negligent and his negligence was a proximate and contributing cause of the plaintiffs' injuries and assessed proportionate liability at 60% to N-500L, 20% to the Government and 20% to Eastern. Judgment was entered against Cornhill and Corporacion jointly and severally. In re N-500L Cases, 517 F.Supp. 825 (D.P.R.1981).
 
 
 6
 There are two basic issues: whether appellants had a right to a jury trial and whether the district court erred in its findings of fault and allocation of liability.
 
 I. RIGHT TO JURY TRIAL
 
 7
 The seventh amendment provides in relevant part, "In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved(.)"
 
 
 8
 The phrase "common law," found in this clause is used in contradistinction to equity, and admiralty, and maritime jurisprudence.... By common law they meant what the Constitution denominated in the third article "law;" not merely suits, which the common law recognized among its old and settled proceedings, but suits in which legal rights were to be ascertained and determined, in contradistinction to those where equitable rights alone were recognized, and equitable remedies were administered .... In a just sense, the amendment, then, may be construed to embrace all suits which are not of equity and admiralty jurisdiction, whatever may be the peculiar form which they may assume to settle legal rights.
 
 
 9
 Parsons v. Bedford, 28 U.S. (3 Pet.) 433, 446, 7 L.Ed. 732 (1830).
 
 
 10
 Although the amendment has historically been held to preserve the right to jury trial as it existed in England when the amendment was adopted in 1791, Baltimore & Carolina Line, Inc. v. Redman, 295 U.S. 654, 657, 55 S.Ct. 890, 891, 79 L.Ed. 1636 (1935); 5 Moore's Federal Practice P 38.08(5) (2d ed. 1980), "it has long been settled that the right extends beyond the common law forms of action recognized at that time." Curtis v. Loether, 415 U.S. 189, 193, 94 S.Ct. 1005, 1007, 39 L.Ed.2d 260 (1974).
 
 
 11
 Whether or not a close equivalent (to a modern cause of action) existed in England in 1791 is irrelevant for Seventh Amendment purposes, for that Amendment requires trial by jury in actions unheard of at common law, provided that the action involves rights and remedies of the sort traditionally enforced in an action at law, rather than in an action in equity or admiralty.
 
 
 12
 Pernell v. Southall Realty, 416 U.S. 363, 375, 94 S.Ct. 1723, 1729, 40 L.Ed.2d 198 (1974).
 
 
 13
 In Ross v. Bernhard, 396 U.S. 531, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970), the Supreme Court held that the right to a jury trial is not dependent on the character of the overall action but rather is to be determined by looking to the nature of the issue to be tried. Id. at 538, 90 S.Ct. at 738. There is thus a right to jury trial on an issue if that issue involves the adjudication of traditional legal rights and remedies. See Pernell, 416 U.S. at 375, 94 S.Ct. at 1729.
 
 
 14
 Appellees argue that the only issue remaining in the case is contribution, which they claim is a right in equity, not law. Appellants characterize the remaining cause of action as contribution but claim that the issues to be tried are the negligence of their insureds, their proportionate fault, if any, relative to appellees and their resultant liability in damages. They also dispute the contention that contribution is an equitable rather than a legal cause of action.
 
 
 15
 Where, as here, a state-created claim is involved, the characterization of an issue as "legal" and thus entitling a party to a jury trial is determined as a matter of federal law. Simler v. Conner, 372 U.S. 221, 222, 83 S.Ct. 609, 610, 9 L.Ed.2d 691 (1963).[5] We have found wide disagreement among the federal courts that have considered whether contribution is a legal or equitable claim. The only court of appeals to specifically hold that contribution is a right enforceable only in equity is the D. C. Circuit. See Dawson v. Contractors Transport Corp., 467 F.2d 727 (D.C.Cir.1972);[6] Jones v. Schramm, 436 F.2d 899 (D.C.Cir.1970). Other courts, including this court, that call contribution an equitable doctrine use the term in its sense of fairness and justice and do not address the jury trial question. See Professional Beauty Supply, Inc. v. National Beauty Supply, Inc., 594 F.2d 1179, 1185 (8th Cir. 1979); Newport Air Park, Inc. v. United States, 419 F.2d 342, 344 (1st Cir. 1969); Huggins v. Graves, 337 F.2d 486, 489 (6th Cir. 1964); Vickers Petroleum Co. v. Biffle, 239 F.2d 602, 606 (10th Cir. 1956); Kittleson v. American Dist. Telegraph Co., 81 F.Supp. 25, 30 (N.D.Iowa 1948), rev'd on other grounds, 179 F.2d 946 (8th Cir. 1950). And still other federal cases expressly hold that contribution, although deriving from equitable principles of fairness, is a legal right arising out of the tort and enforceable in an action at law. Brandt v. Olson, 190 F.Supp. 683, 686-87 (N.D.Iowa 1961); Globig v. Greene & Gust Co., 184 F.Supp. 530, 534 (E.D.Wis.1960).[7]
 
 
 16
 The most recent decision directly addressing the question whether a claim for contribution gives rise to a right to jury trial is Palmer v. United States, 652 F.2d 893 (9th Cir. 1981). Palmer was injured as a result of being struck by a car driven by a government employee. Fisher, whose car had previously collided with another car, had left the scene of the accident and Palmer was standing in the road directing traffic around Fisher's disabled vehicle when he was hit. Palmer sued the government seeking damages for negligence and the government impleaded Fisher as a third-party defendant, claiming a right of contribution under the California doctrine of partial comparative indemnity. Despite jury demands of the plaintiff and third-party defendant, trial was to the court, and Fisher appealed after being held 70% liable in contribution.
 
 
 17
 The court of appeals held that the third-party defendant had a right to a jury trial on the issue of his liability to the third-party plaintiff for contribution.[8] The government had argued, as appellees do here, that contribution is an equitable doctrine with no right to a jury. But the court, drawing on the Supreme Court's analysis in Ross v. Bernhard, 396 U.S. 531, 90 S.Ct. 733, 24 L.Ed.2d 729, looked to the "nature of the issue to be tried" to determine its character and noted that an issue is legal "when its resolution involves the ascertainment and determination of legal rights or justifies a remedy traditionally granted by common law courts." 652 F.2d at 895 (citations omitted). Following Ross and apparently considering the character of the overall third-party action as contribution, the court examined the underlying issues to be tried:
 
 
 18
 (T)he government's claim against Fisher requires a determination of the extent to which Fisher's negligence contributed to Palmer's injuries, the relative fault between Fisher and the government, and whether the government has in fact satisfied the judgment rendered against it in Palmer's original negligence suit. Each of these issues involves determinations of rights and liabilities traditionally arising in common law suits for negligence. Moreover, the government seeks to recover from Fisher a portion of the damages which it was required to pay to Palmer. Recovery of damages is a remedy traditionally granted by common law courts.
 
 
 19
 652 F.2d at 895-96 (citations omitted).
 
 
 20
 We believe this approach is sound. At the heart of the original plaintiffs' claims against appellants and of appellees' contribution claims are allegations of appellants' negligence liability towards the plaintiffs and a claim for damages. Logically, the claim for contribution is derivative of the original plaintiffs' right to sue appellants directly for their negligence. See Fischback & Moore International Corp. v. Crane Barge R-14, 476 F.Supp. 282, 287 (D.Md.1979). It arises out of the tort and turns on the legal relationship between the injured plaintiffs and the contribution defendants-the duty owed the former by the latter-and not on any relationship between the parties to the contribution action. Hence "(i)t is a prerequisite of contribution that the contribution defendant must have been originally liable to plaintiff." Jones v. Schramm, 436 F.2d at 901 (footnote omitted). Unless and until appellants are found liable for the plaintiffs' injuries, it cannot be determined to what extent, if any, they are liable in damages to appellees. We conclude, as did the Ninth Circuit, that these underlying issues of negligence liability and damages are legal in nature and entitled appellants to a jury trial of the contribution claims.
 
 
 21
 Because the tort and contribution actions were all consolidated for trial and appellants had been named as defendants, there can be no doubt that had the plaintiffs' cases gone to trial, appellants were entitled to a jury determination of their liability to plaintiffs. "Where both alleged tortfeasors are joined as co-defendants in an action brought by the victim, the liability to the victim of the second tortfeasor, from whom contribution is sought, is not properly assigned to the non-jury domain of the equity court as finder of fact." Jones v. Schramm, 436 F.2d at 901. The fact that the plaintiffs settled with appellees did not remove the issue of appellants' liability to plaintiffs as a precondition to their liability to contribute. Nor did the legal nature of this issue metamorphose merely because the plaintiffs were no longer in the case. Appellants remained entitled to a determination of their liability for negligence, the extent of their fault relative to appellees, and their proportionate share of damages before they could be held liable for contribution. Because these issues are legal and underlie a claim that "involves rights and remedies of the sort traditionally enforced in an action at law," Pernell v. Southall Realty, 416 U.S. at 375, 94 S.Ct. at 1729, appellants had a right to jury trial.
 
 A. Waiver
 
 22
 The district court held that, although appellants had a right to jury trial on the contribution claim, they had waived it by not making their own timely jury demand and were not entitled to rely on the general demands made by the plaintiffs. The court reasoned that upon settlement of all plaintiffs' claims with Eastern and the Government, the only issue remaining in the case was that of contribution as a third-party claim. Because that issue had not been raised in the plaintiffs' pleadings, the court held the plaintiffs' jury demands did not extend to cover contribution and appellants could not rely thereon.
 
 
 23
 Rule 38 of the Federal Rules of Civil Procedure sets forth the manner in which a party must make his or her demand if a jury trial is desired. It provides in relevant part:
 
 
 24
 (a) Right Preserved. The right of trial by jury as declared by the Seventh Amendment to the Constitution or as given by a statute of the United States shall be preserved to the parties inviolate.
 
 
 25
 (b) Demand. Any party may demand a trial by jury of any issue triable of right by a jury by serving upon the other parties a demand therefor in writing at any time after the commencement of the action and not later than 10 days after the service of the last pleading directed to such issue. Such demand may be indorsed upon a pleading of the party.
 
 
 26
 (c) Same; Specification of Issues. In his demand a party may specify the issues which he wishes so tried; otherwise he shall be deemed to have demanded trial by jury for all the issues so triable. If he has demanded trial by jury for only some of the issues, any other party within 10 days after service of the demand or such lesser time as the court may order, may serve a demand for trial by jury of any other or all of the issues of fact in the action.
 
 
 27
 (d) Waiver. The failure of a party to serve a demand as required by this rule and to file it as required by Rule 5(d) constitutes a waiver by him of trial by jury. A demand for trial by jury made as herein provided may not be withdrawn without the consent of the parties.
 
 
 28
 The second sentence of Rule 38(d) has been interpreted as incorporating a right of reasonable reliance on the jury demand of another party. Where one party has made a demand, others are entitled to rely on the demand with respect to issues covered by the demand and need not make an independent demand of their own. Rosen v. Dick, 639 F.2d 82, 91-92 (2d Cir. 1980); Calnetics Corp. v. Volkswagen of America, Inc., 532 F.2d 674, 690 (9th Cir.), cert. denied, 429 U.S. 940, 97 S.Ct. 355, 50 L.Ed.2d 309 (1976); Collins v. Government of Virgin Islands, 366 F.2d 279, 284 (3d Cir. 1966), cert. denied, 386 U.S. 958, 87 S.Ct. 1026, 18 L.Ed.2d 105 (1967); 5 Moore's Federal Practice P 38.40, at 38-361. This reliance principle is "limited to those instances when a party may reasonably rely on another's demand and when a second demand would, in fact, be superfluous." Rosen v. Dick, 639 F.2d at 91-92. The demand may be relied on by parties other than those directly adverse to the demanding party; if issues embraced by the pleadings containing the demand occur between third parties on a cross-claim, the jury right inheres in those issues as well. Id. at 93.
 
 
 29
 The Rosen case decided the extent of a defendant's right to rely on the jury demand of a codefendant, made in his answer to the plaintiff, for purposes of a cross-claim that included a claim for contribution. Both sides rely on Rosen for their respective positions here. Appellees point to language in the case indicating that a party's jury demand of an adverse party will not cover a third-party claim as to which no demand was made. Appellants argue that the case holds that a nondemanding defendant may rely on a codefendant's demand to the extent common issues appear in the cross-claim.
 
 
 30
 In Rosen the court held that the defendant's demand of the plaintiff did not categorically cover the cross-claims, id. at 93 (emphasis added), but as a general demand it covered all issues between the defendant and the plaintiff. Any issues embraced within that demand that also applied to the third parties were covered by the demand as well and the nondemanding party could rely to that extent. Id. The permitted reliance in Rosen specifically reached those issues embraced by the demand "to the extent they are raised by the claims for contribution and indemnification." Id. at 100.[9]
 
 
 31
 To determine the extent of permissible reliance, the Rosen court reduced the inquiry to the definition of "issue" and what makes one issue different from another. Id. at 94. Or to put it another way, since justifiable reliance is based on recurring issues, the question is, when are issues the same. The definition of an issue for purposes of Rule 38 is not a matter solely of fact or of law. Id. at 94-96. One issue is the same as another when it is based on the same conduct or concerns the same general area of dispute. Lanza v. Drexel, 479 F.2d 1277, 1310 (2d Cir. 1973) (claims of common law fraud and statutory violation were the same where based on same conduct and same allegedly false documents). If the factual allegations underlying two claims are the same or if the issues "turn on the same matrix of facts" the issues are the same. Las Vegas Sun, Inc. v. Summa Corp., 610 F.2d 614, 620 (9th Cir. 1979), cert. denied, 447 U.S. 906, 100 S.Ct. 2988, 64 L.Ed.2d 855 (1980) (claims under two different statutes based on same allegations of conspiracy in restraint of trade were the same).[10] It is both the similarity of facts and the similarity of the matrix-the legal framework in which facts are analyzed-that make issues the same. On the other hand, slight modifications in facts or in the legal theories presented will not usually render issues different. Rosen v. Dick, 639 F.2d at 94-96. The analysis required of the jury must be different-and changes in the facts or the applicable law may produce the difference-for legal issues to be different.
 
 
 32
 Turning to the facts here, the plaintiffs' complaints and amended complaints in this consolidated action were endorsed with a general jury demand. In most of these pleadings, Cornhill and Corporacion were named direct defendants.[11] The issues in the plaintiffs' action as against appellants were the negligence of their insureds, the extent of insurance coverage, and the amount of damages.[12] Appellants could rely on the plaintiffs' general demand as to these issues embraced in those pleadings. See Rosen 639 F.2d 82; Calnetics, 532 F.2d 674. And, because reliance inheres in the issues, not in the posture of the parties who demand or rely, Rosen, 639 F.2d at 93; Collins, 366 F.2d at 284-85, the permissible reliance as to these issues was not limited to the actions in which appellants and the plaintiffs were adverse parties. As we concluded in Part I, the claims for contribution were predicated on the same issue of appellants' liability to the plaintiffs for negligence. The liability issue in the contribution action is based on the same matrix of facts, see Las Vegas Sun, Inc., 610 F.2d at 620, as the issue in plaintiffs' action, i.e. whether or not the actions and omissions of appellants' insureds caused or contributed to the plaintiffs' injuries. Appellants were therefore entitled to rely on the plaintiffs' jury demand to the extent that it embraced the issue of negligence liability. See Rosen, 639 F.2d at 100.
 
 
 33
 In our analysis we have examined contribution by focusing on its constituent parts: liability to the original plaintiffs, proportionate fault among tortfeasors, and liability in damages to the contribution plaintiff. These components defined the issues that would determine whether appellants had a seventh amendment right to a jury trial. Similarly, it is these issues that determine the extent of reasonable reliance on plaintiffs' jury demand for purposes of Rule 38.
 
 
 34
 Although Rule 38 permits a party to rely on another's demand where a second jury demand would be superfluous, that reliance is only reasonable to the extent of issues actually covered by the demand. As the Rosen court stressed:
 
 
 35
 If the first demand does not cover issues pertinent to a second party, the second party cannot rely reasonably on the first demand, and the second demand would be far from superfluous since, without it, the right to a jury trial will have been waived as to those additional issues.
 
 
 36
 639 F.2d at 92 (emphasis original). Professor Moore provides the following illustration:
 
 
 37
 (I)f the demand does not pertain to certain issues then one of the parties concerned with those issues should make demand therefor. Thus assume that A sues X; X answers and also files a third-party complaint against Y. If A makes a timely general demand the demand embraces all the issues between A and X, and X may rely thereon and need not make a demand for those issues. It is rather strained, however, to say that A's general demand embraced the third-party issues between X and Y, with which A is not concerned. It would seem that either X or Y should make a timely demand as to the third-party issues if a jury trial is desired as to those issues.
 
 
 38
 5 Moore's P 38.45, at 38-391-92 n.2. See Rosen, 639 F.2d at 92; McAndrews v. United States Lines Co., 167 F.Supp. 41, 43 (S.D.N.Y.1958).
 
 
 39
 Because the plaintiffs' demand embraced the contribution issue of appellants' tort liability, reliance on the demand for purposes of the contribution claim was reasonable as to that issue; it was an issue between appellants and appellees with which plaintiffs were concerned. But plaintiffs sued all defendants on a theory of joint and several liability. Their concern was not with who among the defendants was more to blame, so long as they could recover their damages fully from some or any party.[13] The proportionate fault among Eastern, the Government and N-500L and the amount some of these defendants might owe to another in contribution were issues with which plaintiffs were not concerned. Their complaints, therefore, cannot reasonably be read as embracing these other contribution issues and reliance on their jury demand for these issues is not reasonable. A separate demand by a party to the contribution claim concerned with these additional issues was required in order to preserve a right to jury trial on them pursuant to Rule 38. Appellees made no jury demand in their pleadings against appellants with respect to the contribution claims. Appellants had ten days from the last of these pleadings in which to make their demand, Fed.R.Civ.P. 38(b), and having failed to do so, they waived their right to trial by jury on these additional issues, Fed.R.Civ.P. 38(d).
 
 
 40
 We think, moreover, that the nature of the contribution claim reasonably should have notified Cornhill that the plaintiffs' initial demand would not assure a jury trial on the issue of proportionate fault. The contribution doctrine permits a tortfeasor against whom a plaintiff has enforced a judgment to recover from other joint and several tortfeasors a proportionate share of the damages paid. In filing cross-claims for contribution, therefore, defendants seek protection not from liability but from disproportionate liability. Here, the cross-claims for contribution introduced the issue of proportion into the case for the first time.
 
 
 41
 This analysis belies the suggestion that Cornhill was unfairly surprised by the settlement of the plaintiffs' liability claim. Because the proportion issue was first injected into the case on the cross-claims, Cornhill's reliance on the plaintiffs' general demand was flawed from the outset. It was not the settlement that resulted in Cornhill's waiver of its jury trial right on the issue of proportion so much as it was Cornhill's failure to demand a jury on an issue not encompassed by the plaintiffs' general demand.
 
 
 42
 If the plaintiffs had not settled and the case had proceeded, appellants would have been entitled to a jury determination of their liability vel non to the plaintiffs. If the jury had found N-500L negligent and had found the negligence to be a proximate cause of plaintiffs' injuries, appellants' proportionate share of liability and damages relative to the other defendants would then have been adjudicated by the trial judge. Such a division of fact-finding functions is expressly contemplated by the Federal Rules, see Fed.R.Civ.P. 38(c); Fed.R.Civ.P. 39(b), and has been recognized as appropriate in contribution cases by the courts. See Rosen, 639 F.2d at 100; Jones v. Schramm, 436 F.2d at 901.
 
 B. Harmless Error
 
 43
 Although we have found that the denial of a jury trial on the issue of appellants' tort liability was erroneous, a new trial is not required if the error was manifestly harmless. See Wright and Miller, Federal Practice and Procedure: Civil § 2323, 105-06 (1971). A finding of harmless error in this context would require a determination that, even if appellants had had a jury trial on the sole issue of N-500L's liability for the plane crash, the trial judge would have had to direct a verdict in favor of appellees, finding that N-500L was at least partially liable as a matter of law. See United States v. Williams, 441 F.2d 637, 644 (5th Cir. 1971); King v. United Benefit Fire Insurance Co., 377 F.2d 728, 731 (10th Cir.), cert. denied, 389 U.S. 857, 88 S.Ct. 99, 19 L.Ed.2d 124 (1967); Freeman Contractors v. Central Surety & Insurance Corp., 205 F.2d 607, 612-13 (8th Cir. 1953). The denial in that event would be harmless because "(t)here is no constitutional right to have twelve men sit idle and functionless in a jury-box." United States v. 243.22 Acres of Land, 129 F.2d 678, 684 (2d Cir.), cert. denied, 317 U.S. 698, 63 S.Ct. 441, 87 L.Ed. 558 (1942). On the other hand, if a jury could sustainably find on this record that the pilot of N-500L was not liable for the accident, then a remand is necessary.
 
 
 44
 We consider the evidence presented at trial in the same manner as if we were reviewing a judgment for directed verdicts in favor of appellees Eastern and the Government on the issue of N-500L's liability. Hayes v. Consolidated Service Corp., 517 F.2d 564, 565-66 & n.2 (1st Cir. 1975); Freeman Contractors, 205 F.2d at 612-13. "We must assume as established all the facts that the evidence on behalf of (appellants) and such favorable inferences as may reasonably be drawn from it tend to prove," Freeman Contractors at 612-13, viewing all of the evidence in the light most favorable to appellants. Estate of Spinosa, 621 F.2d 1154, 1160 (1st Cir. 1980). For purposes of analyzing the negligence liability of appellants, we set forth the evidence adduced at trial focusing chiefly on the conduct of N-500L, appellants' insured. For the most part, the facts leading up to the accident are not in dispute.
 
 
 45
 On September 28, 1978, at approximately 6:30 P. M. local time, N-500L and the Eastern L-1011 were both approaching San Juan International Airport (San Juan) from the west. The L-1011 was being operated as Eastern Flight 75. N-500L, a Beech D-18s aircraft, was being operated by Air Caribbean as an air taxi service for passengers flying from Borinquen Airport at Aguadilla, Puerto Rico, to San Juan. Although it was after dark, weather conditions were good and visibility between the two planes was not restricted. The L-1011 was flying on an instrument flight rule (IFR) plan filed with Air Traffic Control. N-500L, not having filed a flight plan, was being flown under visual flight rules (VFR). Because weather conditions were good (VFR conditions), both pilots were required by Federal Aviation Regulations to see and avoid each other. 14 C.F.R. § 91.67(a) (1982).
 
 
 46
 At 2239:18,[14] the L-1011 was approaching the airport on a 125-degree (southeasterly) heading, and was told by approach control[15] at San Juan to continue its heading, to follow the localizer course to Runway 10 and that it was cleared for the so-called Lagoon Approach to Runway 7.[16] Thirty seconds later, Eastern was advised of eastbound traffic, which it did not see and which turned out to be N-500L.
 
 
 47
 At 2240:40 the pilot of N-500L, Jerry Cannon, contacted San Juan for the first time on this ill-fated trip. He radioed local control while in approach control airspace approximately ten miles west of the airport. The normal landing procedure for a VFR pilot is to contact approach control on the approach control frequency at a reporting point seventeen miles west of the airport. The approach controller would then sequence the plane, i.e. assign its approach sequence, and then hand the control of the aircraft over to the local controller in the tower for landing clearance. But because N-500L's approach control radio frequency was inoperative, the pilot instead called up the local controller at 2240:40, saying, "San Juan Tower, Twin Beech Five Hundred Lima, over Levittown,[17] unable to contact approach."
 
 
 48
 The tower controllers, equipped with a radar repeater scope, saw the target for the L-1011 approaching the target for N-500L from behind. At that time the L-1011 was descending from 3000 feet and was two miles west of the Beechcraft. The cab coordinator then took over from the local controller because the local controller was not qualified to handle aircraft in approach control airspace.
 
 
 49
 Meanwhile, the approach controller contacted the L-1011 at 2241:02 and advised that the traffic it had previously been warned of, the N-500L, was now only two miles away at the L-1011's twelve-thirty/one o'clock position (almost directly ahead) moving east. The Eastern pilot acknowledged seeing the Beechcraft, saying at 2241:09, "Uh, we got one down low."
 
 
 50
 At 2241:15 N-500L was advised by the cab coordinator, "Twin Beech Five Hundred Lima, there's a ten eleven off at your six o'clock at two miles, uh, at three thousand feet overtaking, suggest heading one thirty." This meant that the L-1011 was directly behind N-500L at a distance of two miles and an altitude of 3000 feet and was overtaking the small plane. The suggested heading of 130 degrees would have meant flying in a southeast direction and would have taken N-500L south, and upwind, of the flight path of the L-1011. Eight seconds later pilot Jerry Cannon acknowledged this communication and indicated he saw the L-1011 by saying, "Yeah, I got him." A second later, at 2241:24, the cab coordinator instructed, "OK, plan to follow the ten eleven, and caution wake turbulence," to which Cannon responded at 2241:28, "OK, Five Hundred Lima."
 
 
 51
 The approach controller radioed the Eastern pilot at 2242:31 to advise that the previously unidentified traffic at his twelve o'clock position was in fact N-500L and that the small plane would be following the L-1011 for landing. He also advised the Eastern pilot to switch his frequency from approach control to the tower local control frequency so that he could monitor the tower and be on the same frequency as N-500L. After this point, the cab coordinator was no longer involved in the situation and the local controller took over.
 
 
 52
 Three minutes passed from the first time the L-1011 sighted N-500L until the time of overtaking, during which time the L-1011 was descending to approximately 1400 feet. The crew of the L-1011 had the small plane in sight continuously during this period and saw it cross in front of and beneath them from right to left before the overtake. In their estimation, N-500L was constantly at an altitude of between 250 and 500 feet.
 
 
 53
 At 2243:50, fifteen seconds prior to the overtaking, the pilot of N-500L radioed, "Uh, Five Hundred Lima, I don't have my traffic anymore," meaning he had lost sight of the L-1011.[18] The Eastern crew, which had been monitoring the same frequency, heard this transmission. The local controller, upon receiving this call, looked out the tower window and could not see the small plane-although he saw the L-1011-nor could he see it on his radar repeater scope due to an obscuration on the scope. At 2243:57, seven seconds after the lost traffic call from N-500L, the local controller advised, "Beech Five Hundred Lima, continue approach for runway one zero (Runway 10)," to which N-500L responded six seconds later at 2244:03, "OK, one zero." Two seconds later, at 2244:05, at an altitude of approximately 1300 feet, the L-1011 overtook and passed N-500L above and on the right side of it, passing close enough for an Eastern crewman to observe the silhouettes of the small plane's passengers.
 
 
 54
 At approximately 2244:45, forty seconds after being overtaken, N-500L flew into the wake turbulence generated by the L-1011. Wake turbulence is an air disturbance caused by the movement of the wings through the air creating two counter-rotating cylindrical vortices trailing from the wing tips. Once wake turbulence is created, the vortices drift downward and move according to wind direction and velocity.[19] A "heavy" aircraft such as the L-1011, weighing more than 300,000 pounds, creates a dangerous amount of wake turbulence which may cause an encountering plane to roll out of control. It was stipulated that N-500L's encounter with the wake turbulence of the Eastern jet caused the small plane to crash.
 
 
 55
 From the time N-500L was overtaken until the time of wake encounter, forty seconds elapsed. There was evidence that, although there may have been a time when Cannon would not have been able to see the overtaking plane due to a blind spot caused by the countour of the cockpit, he would have been able to see the L-1011 twenty seconds after overtake without having to turn his head or crane his neck. Thus, the pilot of N-500L had at least twenty seconds before the wake encounter to pick up the other plane and execute an evasive maneuver.
 
 
 56
 Under the Federal Tort Claims Act, this case is governed by the substantive law of Puerto Rico, where the injury occurred. 28 U.S.C. § 1346(b); Richards v. United States, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962). See Bonn v. Puerto Rico International Airlines, Inc., 518 F.2d 89, 91 (1st Cir. 1975). According to Puerto Rico law, a party is liable for the injuries caused by his negligent conduct if it is foreseeable that the conduct will cause injury. Cruz Costales v. Commonwealth, 89 P.R.R. 102, 106 (1963). A party's negligence is the legal cause of the harm suffered if the injury would not have occurred absent that party's negligent conduct. Pabon Escabi v. Axtmayer, 90 P.R.R. 20, 27 (1964). Moreover, it is not necessary that the conduct be the sole proximate cause of the injury as long as it is a proximate cause. Widow of Andino v. W. R. A., 93 P.R.R. 168, 178 (1966). Where the defendant is a public carrier, such as Air Caribbean here in its operation of N-500L, it owes the highest degree of care to its passengers. Munoz v. New York and Porto Rico Steamship Co., 72 P.R.R. 543, 546 (1951).
 
 
 57
 The Federal Aviation Administration (FAA) has promulgated regulations (FARs) that govern, inter alia, the operation of airplanes by pilots. Pilots' "rules of the road" are found in Part 91 of Title 14 of the Code of Federal Regulations, with additional rules for air taxi operations, such as N-500L in this instance, located in Part 135. These regulations have the force and effect of law, Tilley v. United States, 375 F.2d 678, 680 (4th Cir. 1967); United States v. Schultetus, 277 F.2d 322, 327 (5th Cir.), cert. denied, 364 U.S. 828, 81 S.Ct. 67, 5 L.Ed.2d 56 (1960), and their violation in negligence per se. Gatenby v. Altoona Aviation Corp., 407 F.2d 443, 446 (3d Cir. 1968); Insurance Co. of North America v. United States, 527 F.Supp. 962, 967 (E.D.Ark.1981). See Ramos Oppenheimer v. Leduc, 103 D.P.R. 342, 345 (1975).
 
 
 58
 In addition to the FARs, the FAA publishes the Airman's Information Manual (AIM) in order to explain to pilots the application of the FARs in various situations. FAA Advisory Circulars are also promulgated on various topics to advise pilots of methods of avoiding certain hazardous conditions, such as Advisory Circular AC 90-23D (December 15, 1972) dealing with wake turbulence. The AIM and Advisory Circulars are evidence of the standard of care among all pilots, Muncie Aviation Corp. v. Party Doll Fleet, Inc., 519 F.2d 1178, 1180-81 (5th Cir. 1975), and it is assumed that all pilots have read and know their provisions. Associated Aviation Underwriters v. United States, 462 F.Supp. 674, 680 (N.D.Tex.1979).
 
 
 59
 The AIM also contains information on wake turbulence and recommends procedures for avoiding it. Pilots are advised that air traffic controllers will warn a VFR aircraft of a wake turbulence hazard from a nearby plane but they are reminded, "WHETHER OR NOT A WARNING HAS BEEN GIVEN, HOWEVER, THE PILOT IS EXPECTED TO ADJUST HIS OPERATIONS AND FLIGHT PATH AS NECESSARY TO PRECLUDE SERIOUS WAKE ENCOUNTER." AIM at 108 (July 1978) (emphasis original). Because the vortices drift behind and below the generating aircraft, pilots are advised to stay at or above the flight path of the generating plane, altering their course as necessary to avoid the area below and behind the plane. AIM at 107-08. See also Advisory Circular AC 90-23D (December 15, 1972). N-500L was never at or above the L-1011's flight path.
 
 
 60
 When a pilot is operating under VFR, or clear weather, conditions, he has the responsibility to see and avoid other aircraft. 14 C.F.R. §§ 91.67(a), 91.65(a).[20] This responsibility extends beyond observing and staying away from other traffic; it requires vigilance with regard to wake turbulence as well. Pilots are instructed that "the flight disciplines necessary to assure vortex avoidance during VFR operations must be exercised by the pilot. Vortex visualization and avoidance procedures should be exercised by the pilot using the same degree of concern as in collision avoidance." AIM at 108.
 
 
 61
 Although air traffic controllers may have responsibilities concurrent with those of the pilot in the terminal area, see Delta Air Lines, Inc. v. United States, 561 F.2d 381, 392 (1st Cir. 1977), cert. denied, 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978), the primary responsibility for avoiding collision and wake turbulence in VFR conditions is with the pilot. Miller v. United States, 587 F.2d 991, 996 (9th Cir. 1978); Kack v. United States, 570 F.2d 754, 756 (8th Cir. 1978), aff'g, 432 F.Supp. 633 (D.Minn.1977); Richardson v. United States, 372 F.Supp. 921, 926-27 (N.D.Cal.1977); Wenninger v. United States, 234 F.Supp. 499, 516-17 (D.Del.1964), aff'd, 352 F.2d 523 (3d Cir. 1965). This is so regardless of whether a clearance has been given by the controller, Kack, 570 F.2d at 756, because the pilot generally is in the best position to see other aircraft around him and to visualize their vortex trails. Richardson, 372 F.Supp. at 927.[21]
 
 
 62
 A good deal of evidence in this case focused on interpreting the transcript of communications between the tower and the two aircraft. The significance of certain of these transmissions is not in dispute. First, the tower communication with N-500L at 2241:28 effected visual separation between the small plane and the L-1011. Visual separation is one of three methods used by air traffic controllers to space aircraft safely apart from each other in a Stage III Terminal Radar Service Area (TRSA) such as San Juan. Stage III separation may be visual, vertical, or by radar. Air Traffic Control Manual § 21 P 1282 (July 1, 1978) (ATCM).
 
 
 63
 There can be no dispute that when N-500L acknowledged seeing the L-1011 and local control radioed, "OK, plan to follow the ten eleven ...," visual separation was established upon the pilot's response, "OK, Five Hundred Lima." From that point on, Cannon assumed responsibility for providing his own separation from the heavy jet, by keeping at a safe altitude, turning his airplane, and essentially doing whatever was necessary to keep the L-1011 in sight at all times and avoid it and its wake turbulence. The pilot expert witnesses agreed that pilots understand that when they fly VFR they must maintain their own visual separation. The following portions of the AIM explain to pilots the establishment and effect of visual separation:
 
 
 64
 1. Visual separation is a means employed by ATC (air traffic control) to separate aircraft only in terminal areas. There are two methods employed to effect this separation:
 
 
 65
 a. ...
 
 
 66
 b. A pilot sees the other aircraft involved and upon instructions from the controller provides his own separation by maneuvering his aircraft as necessary to avoid it. This may involve following in-trail behind another aircraft or keeping it in sight until it is no longer a factor.
 
 
 67
 2. A pilot's acceptance of traffic information and instructions to follow another aircraft or provide visual separation from it is considered by the controller as acknowledgment that the pilot sees the other aircraft and will maneuver his aircraft as necessary to avoid it. In operations conducted behind heavy jet aircraft the pilot's acceptance of traffic information and instructions to follow the heavy jet or provide visual separation from it is considered by the controller as acknowledgement that the pilot sees the heavy jet and accepts the responsibility of providing his own wake turbulence separation.
 
 
 68
 AIM at 54. See also "Pilot/Controller Roles and Responsibilities," AIM at 81 ("Acceptance of both traffic information and instructions to follow another aircraft is pilot acknowledgment that he sees the other aircraft and will maneuver his aircraft as necessary to avoid it or maintain in-trail separation.-The pilot also accepts responsibility for wake turbulence avoidance separation under these conditions.")The "plan to follow" instruction from the tower at 2241:24 did more than complete the process of establishing visual separation for N-500L. It also informed N-500L that it was second in sequence for landing after the Eastern jet and meant that the pilot should maneuver his aircraft behind the L-1011 at a safe interval. It is undisputed that Cannon did not follow this instruction, and his failure to do so constituted a violation of 14 C.F.R. § 91.75(b) which provides: "Except in an emergency, no person may, in an area in which air traffic control is exercised, operate an aircraft contrary to an ATC instruction." The unrebutted opinion of the pilot experts was that if the pilot of N-500L had prudently complied with the "plan to follow" instruction, the crash would not have occurred.
 
 
 69
 It could not be disputed, in the face of the lost-traffic "admission" of Cannon at 2243:50, that he lost sight of the L-1011 which he had a duty to see and avoid at all times. The jet was overtaking him at this time, and forty seconds would elapse before N-500L encountered the wake turbulence. Although there was no affirmative evidence that Cannon regained sight of the L-1011, all experts agreed that he would have been able to see the plane at least fifteen to twenty seconds prior to the turbulence encounter from about the time that the jet came abeam of his plane.[22] Furthermore, it was unrebutted that, even in this short amount of time, a pilot could have, and a prudent pilot would have, realized the immediate wake turbulence hazard and maneuvered out of the way of the L-1011's flight path. Under the prevailing clear weather conditions, Cannon was in the best position to visualize and avoid the wake turbulence generated by the L-1011 after the overtaking. See Richardson, 372 F.Supp. at 927; Thinguldstad v. United States, 343 F.Supp. 551, 557 (S.D.Ohio 1972); Sanbutch Properties, Inc. v. United States, 343 F.Supp. 611, 615 (N.D.Cal.1972). He, therefore, had a duty to do so. From N-500L's position below and to the left of the L-1011 at the time of overtaking, Cannon should have known that a left turn would have taken him away from the wake of the L-1011 and its blanket of turbulence. Francisco Cruz, a pilot and the owner of N-500L, testifying on behalf of appellants, stated that a pilot making the air taxi run from Aquadilla to San Juan would stay off the localizer course to Runway 10 because he would know it to be the normal flight path of IFR flights such as Eastern Flight 75. This means that Cannon should have known that the best way to avoid the wake of the L-1011 was a left turn, even if he did not know the exact course of the L-1011. Although the exact flight path of N-500L at the overtaking point is unknown, there is no question that the pilot did not execute the left turn that the experts agreed would have taken him out of harm's way. Based on the evidence, it can only be concluded that a prudent pilot should have known that a left turn just prior to or at the time of overtaking would have avoided the turbulence. Instead of turning left, N-500L flew a course that brought it well within the vortex of turbulence. By negligently failing to alter his flight path so as to avoid the wake turbulence, the pilot of N-500L contributed to the cause of the accident.
 
 
 70
 Focusing solely on appellants' evidence and assuming as true the facts it tends to prove, we find nothing to rebut the facts giving rise to the inescapable conclusion that the pilot of N-500L was negligent to some degree as a matter of law. At the most, appellants' evidence proves that the controllers and Eastern were also negligent and that their negligence, along with that of the pilot of N-500L, contributed to the accident. But since N-500L's negligence need only be a proximate cause of the accident in order for it to be liable, see Widow of Andino v. W. R. A., 93 P.R.R. 168, proof of the others' negligence is unavailing as a defense and may only serve to reduce appellants' proportion of fault.
 
 
 71
 Appellants' first witness was Francisco Cruz. The main thrust of his testimony was that Cannon could not have been flying as low as the Eastern crew estimated (250 feet) from the water tank to the site of the crash because of an 800-foot high obstacle. Also, he stated, the plane would have to be flown at full power at an altitude of 250 feet. Because it was stipulated at trial that there was no evidence that N-500L flew above 1000 feet, the height required by 14 C.F.R. § 91.79(b), at any time throughout this incident, Mr. Cruz' evidence was of no consequence to appellant's case.
 
 
 72
 The second witness on behalf of appellants was Stephen Crow, a Ph.D. in aerodynamics and applied mathematics, who was testifying as an expert on wake turbulence and aviation accident reconstruction. Dr. Crow gave an opinion in three areas. He testified that (1) the pilot of N-500L followed the instructions of the local controller and followed the suggested 130-degree heading and also turned his airplane to the right towards Runway 10 when instructed to "continue approach for runway one zero"; (2) the altitude of N-500L at the time of the wake encounter was 838 feet, at which point the plane struck the center of the vortex; and (3) based on his own visibility studies of the cockpit of a Beechcraft similar to N-500L, the Eastern L-1011 was obscured from Cannon's view for approximately twenty to twenty-five seconds.
 
 
 73
 We will assume, despite overwhelming evidence to the contrary, that Cannon followed the tower instructions. And we will even assume he interpreted the last one to mean "turn to the right," despite the unanimous opinions of the pilot experts that a pilot would understand "continue approach to runway one zero" to mean, continue previous course and continue to follow previous instructions, e.g. to follow the L-1011 and to watch out for wake turbulence. But neither of these assumptions nor the other opinions of Dr. Crow exonerate N-500L. A pilot cannot be freed of his responsibility when flying VFR to see and avoid other aircraft and their vortices by simply following blindly the instructions of the tower. This was not a situation where the tower told the pilot to stay close behind a heavy jet during landing, in which case the pilot would be expected to rely on the controller rather than on his own judgment. See Yates v. United States, 497 F.2d 878 (10th Cir. 1974). Here, the pilot was flying in clear weather conditions, had acknowledged seeing the L-1011 and agreed to follow it under conditions in which he would provide his own wake turbulence separation. In these circumstances, the controllers could assume that the pilot of N-500L would follow instructions and fly clear of perceived dangers, as the FARs require. See Colorado Flying Academy v. United States, 506 F.Supp. 1221, 1228 (D.Colo.1981); Baker v. United States, 417 F.Supp. 471, 486 (N.D.Wash.1975). Regardless of the clearance given, Cannon had a duty to visualize and avoid the L-1011's wake turbulence, Kack, 570 F.2d at 756. The most that can be said for this portion of Dr. Crow's evidence is that it may tend to show the fault of the controllers for issuing the wrong heading and instructions. But it cannot relieve the pilot of N-500L of his direct responsibility for the operation of his aircraft, 14 C.F.R. § 91.3(a), and his primary duty to avoid a hazard that he himself could or should have perceived. Spaulding v. United States, 455 F.2d 222, 226 (9th Cir. 1972); Thinguldstad, 343 F.Supp. at 558.
 
 
 74
 Nor does Dr. Crow's opinion as to N-500L's altitude at the time of wake encounter help appellants. He testified that at 838 feet the Beechcraft flew roughly into the center of the vortex of turbulence and that the vortex would be dangerous for another one hundred feet above its center. Hence, N-500L would have had to have been at an altitude of at least 938 feet at the place where it encountered the wake in order to have been safe. Far from absolving N-500L of liability, this evidence tends to show that the pilot's failure to fly above 1000 feet, as required by 14 C.F.R. § 91.79(b), was a proximate cause of the accident, because such failure brought N-500L within the turbulence wake.
 
 
 75
 As for the evidence on visibility, this too is damning. In the first place, the mere fact that a pilot may experience temporary loss of visibility due to a blind spot when looking out his window is no excuse for failing to follow Federal Aviation Regulations. Miller v. United States, 303 F.2d 703, 709 (9th Cir. 1962), cert. denied, 371 U.S. 955, 83 S.Ct. 507, 9 L.Ed.2d 502 (1963). All a pilot need do in that situation is bank slightly. Moreover, "(a) pilot has a continuing duty to be aware of danger when, with his own eyes, he can perceive the danger." Thinguldstad, 343 F.Supp. at 558 (emphasis added). This means that a pilot flying in VFR conditions must maintain sight of other aircraft and must, therefore, regain sight of traffic if it is lost momentarily. The evidence showed that the L-1011 would have become visible to N-500L for almost twenty seconds prior to the wake encounter. Dr. Crow admitted that in only a few seconds' time Cannon could have changed his heading sufficiently to remove himself from the hazard. In this period of time, immediately prior to the encounter, when Cannon must or should have seen the L-1011 descending in front and to the right of him, he was in the best position to visualize the path of Eastern's wake turbulence and to realize that he would be in danger unless he executed an evasive maneuver.
 
 
 76
 Finally, appellants introduced the opinion evidence of two air traffic control experts, Martin Sonnett, who testified in court, and Frank McDermott, whose deposition was introduced. The testimony of both witnesses was aimed at cataloguing the errors of the air traffic controllers on duty the night of the accident. Primarily, both men gave the opinion, based on their interpretation of the Air Traffic Control Manual provisions on TRSA Stage III service, that the controllers should have positioned N-500L behind the L-1011 by means of standard (vertical) or radar separation before arranging for visual separation.
 
 
 77
 Assuming this interpretation is correct and the controllers failed in their duty, this cannot relieve the pilot of his basic and primary see-and-avoid responsibilities flying VFR. Only if it were standard procedure that a VFR pilot may rely on the belief that prior radar separation had been established before his see-and-avoid duty is triggered could the pilot conceivably be exonerated here. But the FARs do not contemplate such reliance, see 14 C.F.R. § 91.67(a), and no evidence was presented to support such a theory. Sonnett was construing the ATCM, which instructs controllers, not pilots. McDermott acknowledged that he was not a pilot and could not testify as to what pilots are required to do.
 
 
 78
 The only evidence relative to this point is contained in the Airman's Information Manual, the provisions of which all pilots are charged with knowing. Associated Aviation Underwriters, 462 F.Supp. at 680. The section of the AIM explaining TRSA service to pilots ends with this cautionary reminder: "PILOTS RESPONSIBILITY: THESE PROGRAMS (Terminal Radar Programs for VFR Aircraft) ARE NOT TO BE INTERPRETED AS RELIEVING PILOTS OF THEIR RESPONSIBILITIES TO SEE AND AVOID OTHER TRAFFIC OPERATING IN BASIC VFR WEATHER CONDITIONS...." AIM at 32 (emphasis original). Thus, whether or not the controllers had acted in conformity with the Air Traffic Control Manual before establishing visual separation is immaterial to the issue of the pilot's duty to maintain visual separation and to see and avoid potential hazards.
 
 
 79
 In light of the duty of N-500L's pilot to see a duty undiminished by any contributing fault of the air controllers, and avoid wake turbulence, a duty undiminished by any contributing fault of the air controllers, the unrebutted evidence that he failed to do so and that but for this conduct the crash would not have occurred, we conclude that N-500L was liable, at least in part, as a matter of law for the accident. It follows, therefore, that a jury verdict in favor of N-500L would not have been permitted to stand, and the error in denying a jury trial to appellants on the issue of N-500L's liability to plaintiffs was harmless.
 
 II. THE RULINGS AND FINDINGS BELOW
 
 80
 Finally, we turn to the argument that the district court applied incorrect legal standards and made clearly erroneous findings of fact. We find no errors of law in either the application or interpretation of the pertinent legal standards. The district court made twenty-five specific rulings of law addressed to the Federal Aviation Regulations, FAA Advisory Circulars, the Airman's Information Manual, and the Air Traffic Control Manual. Appellants have not pointed specifically to any of these as being incorrect; they assert generally that the Air Traffic Control Manual put priority responsibility on the air traffic controller for the separation of aircraft and, therefore, the controllers were responsible for the accident. As we have already explained, it was the pilot of N-500L, not the controllers, that had the primary and inescapable responsibility for the safety of his plane and passengers. The duty of the air traffic controllers under all of the applicable standards was, at the most, concurrent with that of the pilot, not preemptive of it. See Miller v. United States, 587 F.2d at 995.
 
 
 81
 In reviewing the findings of the district court, we are prescribed by the clearly erroneous standard and must give due regard "to the opportunity of the trial court to judge of the credibility of the witnesses." Fed.R.Civ.P. 52(a). Appellants argue that proper visual separation was not established by the controllers and that from sequencing to overtaking, the controllers breached their duty of care to converging aircraft. Before discussing the evidence on the liability of the controllers, it is to be noted that the Government admitted liability and the district court found liability on the part of the local controller. 517 F.Supp. at 832 Finding No. 22. It is, therefore, not a question of whether the controllers were liable, but whether the district court's allocation of 60% liability to N-500L was clearly erroneous.
 
 
 82
 Air controller Hagen, the cab coordinator, testified that he arranged for proper visual separation of the aircraft in accord with the provisions of the Air Traffic Control Manual and that he expected N-500L to follow the L-1011 and avoid its wake turbulence as warned. The Government's expert, James B. Rowen, an air traffic control specialist in the Accident and Incident Analysis Branch of the Federal Aviation Administration, had considerable experience as a pilot of the same type of aircraft as N-500L (Twin Beech). He testified at length as to the duties of air traffic controllers under the circumstances leading up to the crash. It was his opinion that, aside from three minor infractions[23] the controllers did everything correctly and did not cause or contribute to causing the accident. If this testimony had been accepted in toto, as it could have been, the district court, leaving aside the admission of liability by the Government, would not have been clearly erroneous in finding no liability on the part of the Government. See Delta Air Lines v. United States, 561 F.2d 381. It follows, therefore, that the allocation of 20% liability to the controllers was not reversible error.
 
 
 83
 There was also evidence which, if accepted in full, established that Eastern Airlines was blameless. In addition to the testimony of the crew of the L-1011, there was expert testimony by two well-qualified witnesses that put the cause of the crash solely on the pilot of N-500L. Captain Paul Soderlind (also spelled Soderline and Soderlund in the Appendix) had over 20,000 hours as a captain of various types of aircraft and had written and lectured extensively on jet wake turbulence. It was his opinion that pilot Cannon was careless to the point of recklessness and that the accident was caused because N-500L turned towards the flight path of the L-1011 instead of turning away from it. Richard Coxey, a federal aviation safety inspector with 2,500 hours on Beech-Craft planes, testified that the pilot of N-500L violated the Federal Air Safety Regulations in six different ways:
 
 
 84
 1. he flew at too low an altitude over a congested area;
 
 
 85
 2. he did not fly the Visual Approach Slope Indicator;
 
 
 86
 3. he did not stay well clear of the other aircraft;
 
 
 87
 4. he failed to follow the L-1011 prudently;
 
 
 88
 5. he did not maintain adequate separation from the L-1011; and
 
 
 89
 6. he failed in his duty to see and avoid the other aircraft.
 
 
 90
 It was Coxey's opinion that the accident happened because the pilot of N-500L made a judgment error, not influenced by the air controller instructions, and turned into the wake turbulence of the Eastern airliner. Since the testimony of both these witnesses completely exonerated Eastern, it follows that the court's finding that Eastern was 20% at fault was not clearly erroneous.
 
 
 91
 Appellant's final shot is that the district court failed to make adequate findings and explain the allocation of 60% liability to N-500L. "An appellate court is not a jury and appellant is not entitled to a trial de novo on the percentage finding." Hanover Insurance Co. v. Puerto Rico Lighterage Co. 553 F.2d 728, 731 (1st Cir. 1977). The district court made twenty-five separate findings of fact. Its finding that the pilot of the N-500L was 60% liable was predicated on the following factors, all of which have a firm evidentiary basis. Because of the clear weather conditions, VFR flight rules were operative which required pilots to see and avoid each other regardless of the type of clearance received from air traffic control. Finding No. 3. All pilots with a reasonable amount of proficiency know or should know that an L-1011 generates a dangerous amount of wake turbulence. Finding No. 10. If the pilot of N-500L had taken the course of 130 degrees suggested by the controller "for an appropriate length of time, he would have removed himself from the flight path of EAL 75 and would have never encountered the wake turbulence created by said aircraft." Finding No. 11. "A pilot accepting an instruction to follow another aircraft becomes solely responsible for maintaining safe separation from that other aircraft and its wake turbulence." Finding No. 12. N-500L never flew above 1000 feet; operating at this altitude was a violation of Federal Aviation Regulations and a proximate cause of the crash. Finding No. 15. The failure of the pilot of N-500L to keep the L-1011 in sight, maintain visual separation and maneuver out of its path violated the good operating practices of the Airman's Information Manual and the Advisory Circular, was negligence and a proximate cause of the accident. Finding No. 16. The pilot of N-500L had between twenty and forty seconds after overtake to see the L-1011, which was a "flying condominium," and take evasive action. Finding Nos. 23 and 24. The failure of the local controller to assist the pilot after he lost sight of the L-1011 did not relieve the pilot of his responsibility to maintain visual separation and visualize and avoid wake turbulence. Finding No. 25.
 
 
 92
 By contrast, the court made only one finding as to the liability of the controllers, No. 22, and one as to the L-1011, No. 19.
 
 
 93
 The evidence as to the liability of the pilot of N-500L was overwhelming; as to Eastern and the Government, it was minimal. We rule that the findings of the district court and the allocation of liability were not clearly erroneous and that the court spelled out the reasons for its allocation of liability with sufficient particularity.[24]
 
 
 94
 Affirmed.
 
 
 
 *
 Of the District of Rhode Island, sitting by designation
 
 
 [1]
 In Puerto Rico a right of contribution arises when one or more of several joint tortfeasors has paid more than the proportionate share of damages to an injured party. See Garcia v. Government of the Capital, 72 P.R.R. 133 (1951); P.R.Laws Ann. tit. 31, § 3109 (1976)
 
 
 [2]
 Puerto Rico permits direct actions against insurance companies. P.R.Laws Ann. tit. 26, § 2003 (1976). Cornhill was named as direct defendant in six actions and Corporacion was so named in fourteen actions
 
 
 [3]
 Although the plaintiffs were not entitled to a jury in their claims against the Government, 28 U.S.C. § 2402, the district court granted their motions for an advisory jury
 
 
 [4]
 The third-party claims and cross-claims against Cornhill and Corporacion were not endorsed with a jury demand, nor did Cornhill and Corporacion, as third-party defendants, request a jury trial. Cornhill did, however, request a jury trial in its third-party complaint against Eastern's insurer
 
 
 [5]
 The district court held that appellants had a seventh amendment right to a jury trial on the contribution claim but did so by looking to the substantive law of contribution in Puerto Rico
 
 
 [6]
 The majority view in Dawson prevailed over a vigorous and thorough dissent which traced the history of contribution in England and concluded that it was a right enforceable at common law
 On its facts Dawson is distinguishable from the case at bar. That case involved a third-party action against the plaintiff's employer for a "Murray" credit, a declaration of the employer's liability for the plaintiff's injury that would entitle the defendant to a 50% credit against his liability in damages to the plaintiff. The credit was designed as a form of contribution in cases where an employer was immune from suit because of workers' compensation laws. Because it is in the nature of declaratory relief, the "Murray" credit must be distinguished from a contribution claim which seeks the legal remedy of damages.
 
 
 [7]
 In Brandt, a case decided before the Supreme Court decided Simler, the court looked to state law for resolving this issue rather than to federal law as is now required. The Globig court was applying the Federal Tort Claims Act
 
 
 [8]
 The conduct of the parties in proceeding without a jury was held not to be a waiver of the right
 
 
 [9]
 The court held that the demand did not categorically cover the cross-claims for contribution. But contrary to the representations in Eastern's brief, it did not hold that the contribution defendant could not rely on the demand for purposes of the contribution issues. The court held in effect that, while the contribution defendant was not entitled to a jury trial of the entire contribution claim, it was entitled to a jury's determination of those specific issues underlying the claim for which a jury demand had already been made. If all of the issues underlying the contribution claim had been raised by the pleadings in which there was a demand, the defendant would then have been entitled to a jury trial on each of those issues, i.e. on the entire claim, for reliance would then have been reasonable to that extent
 
 
 [10]
 Lanza and Las Vegas Sun deal with the analogous situation where a party that has previously waived a jury may later demand one as to new issues raised subsequently. The party may not "revive" the right already waived if the so-called "new" issues are essentially the same as existing ones. See Rosen v. Dick, 639 F.2d 82, 94 (2d Cir. 1980)
 
 
 [11]
 We note that our view of the extent to which Cornhill and Corporacion, as contribution defendants, may rely on the plaintiffs' demands is not dependent on the procedural postures of the parties. Corporacion had been sued by the plaintiffs and by appellees in their third-party claims. Although the plaintiffs eventually voluntarily dismissed their claims against it in the course of resolving an insurance coverage dispute, Corporacion thereafter remained in the case as a third-party defendant. Its right to rely on the existing jury demands did not evaporate upon its dismissal as a direct defendant, for the right inheres in the issue to be tried. See generally Rosen v. Dick, 639 F.2d 82 (2d Cir. 1980)
 
 
 [12]
 In a pretrial order, the court had ordered that all issues of liability, insurance coverage, and damages would be tried together as to all parties in one jury trial
 
 
 [13]
 We note that as a practical matter in a case of this type where several alleged joint tortfeasors are sued, the plaintiffs would most likely attempt to establish the negligence of one defendant, who would then defend by proving the negligence of the others
 
 
 [14]
 All times are Greenwich Mean Time. 2239:18 translates to 6:39:18 P. M. Atlantic Standard Time
 
 
 [15]
 Three FAA controllers were working at San Juan International Airport on the night of the accident. The local controller and the cab coordinator were stationed in the glass-enclosed tower cab. The approach controller was stationed in the radar room below the tower. Approach normally handled incoming traffic, sequencing approaching aircraft, until it was passed to the local control position, which controlled landings. The cab coordinator, as his name implies, was responsible for coordinating the two functions and the activity in the tower cab
 
 
 [16]
 The approach to the airport from the west normally follows the localizer-a radio beam which lines the plane up in the direction of the runway-east to Runway 10. A pilot may, however, if he chooses, track the localizer as far east as the San Jose Lagoon on the western edge of the airport and then turn left thirty degrees and proceed visually to land on Runway 7, which is closer to the terminal building than Runway 10. The flight data recorder on board the L-1011 indicated that this was in fact the flight path taken by it
 
 
 [17]
 Levittown Water Tank is a VFR reporting point
 
 
 [18]
 This transmission was followed by a background comment in the tower, "I don't believe you," which could not be heard by N-500L. Mr. Gutierrez, the local controller, testified that if he said that it was because an L-1011 is like a "flying condominium," extremely large and well-lit, i.e. difficult to lose
 
 
 [19]
 The wind that night was from a southeasterly direction at five knots per hour on the ground. When the L-1011 was cleared for landing at 2243:05 it was given this information. The transmission was over the tower frequency, the same frequency N-500L was on, and was made one minute prior to the overtake
 
 
 [20]
 This applies to VFR and IFR flights alike. 14 C.F.R. § 91.67(a)
 
 
 [21]
 Where the plane encountering the wake turbulence was in an actual landing procedure and the controller advised the pilot to keep his aircraft close behind the descending jet transport, stating that there were other planes behind him, and failed to warn of wake turbulence, the controller was held solely liable for the crash. Yates v. United States, 497 F.2d 878 (10th Cir. 1974). In Hartz v. United States, 387 F.2d 870 (5th Cir. 1968), the controller was held liable because he was in a better position during takeoff to appreciate the wake turbulence hazard and negligently failed to warn of it. In the case at bar, however, the planes were several miles away from the airport and the controllers' superior ventage point and the controller had warned N-500L of the danger of wake turbulence. See Thinguldstad v. United States, 343 F.Supp. 551, 557-58 (S.D.Ohio 1972)
 
 
 [22]
 Even Sonnett testified that notwithstanding the controller's "continue approach for runway one zero" instruction, assuming the pilot of N-500L saw the L-1011 descend in front of him the pilot still had the responsibility at that time to maneuver his plane as necessary to avoid the wake turbulence. Sonnett's testimony is discussed at page 32, infra
 
 
 [23]
 Failure to state radar contact on an initial contact, failure to issue the winds, the runway or altimeter, and failure to state to the aircraft that it was not in sight when it was cleared to land. In Federal Express Corp. v. State of R. I., Dept. of Transportation, 664 F.2d 830, 835 (1st Cir. 1981), we held that "slight deviations from manual procedure do not necessarily constitute negligence ...."
 
 
 [24]
 We find no grounds for error in the fact that the district court gave an opinion from the bench at the conclusion of the evidence that N-500L's liability was 40%. The court specifically stated: "The finding that I will make at this time will be subject to change at such time as I enter a final order."