**SANBUTCH PROPERTIES, INC. and
Gulf Insurance Company,
Plaintiffs,**

v.

**UNITED STATES of America,
Defendant.**

No. C–70–1227.

United States District Court,
N. D. California.

May 22, 1972.

**612**

John D. Collins, San Diego, Cal., for plaintiffs.

John R. Harrison, Department of Justice, Washington, D. C., for defendant.

## MEMORANDUM OF DECISION

CONTI, District Judge.

This court has jurisdiction of the subject matter and parties to this action by virtue of the Federal Tort Claims Act, 28 U.S.C. § 1346(b) et seq. The action herein arose as a result of the crash of a Cessna airplane upon landing at the San Francisco International Airport on Runway 28 left on November 18, 1969.

1. Sanbutch Properties, Inc. was the owner, and S. & Q. Construction Company was the lessee, under a non-exclusive rental agreement, of aircraft N1053Q, a Cessna Model 310, on November 18, 1969.

2. The aircraft crashed on an approach for landing at San Francisco International Airport (SFO) while being operated by S. & Q. Construction Company through its agent (pilot) McKinley R. Clark.

3. At the time of the occurrence the aircraft was the subject of a policy of insurance providing, inter alia, hull coverage, or "Coverage F—All Risks Ground and Flight", purchased by S. & Q. Construction Company and issued by plaintiff Gulf Insurance Company, a corporation, naming Sanbutch Properties Inc. and S. & Q. Construction Company as joint insureds.

4. Gulf Insurance Company is the subrogee of Sanbutch Properties and S. & Q. Construction Company, as joint subrogors.

5. Gulf Insurance is seeking to recover its payment, pursuant to the policy, of $25,746.90.

6. Sanbutch Properties, Inc. is seeking to recover damages in the sum of $3,750.10.

7. The approach of 53Q to SFO was conducted in visual flight conditions, pursuant to visual flight rules.

8. The pilot of 53Q was directly responsible for, and the final authority as to the operation of the aircraft.

9. The pilot of 53Q was advised, during initial and subsequent communica-

tions by radio, to plan a right pattern to Runway 28R (right).

10. The pilot of 53Q failed to enter a right traffic pattern, instead he positioned the aircraft for an entry into a left traffic pattern for a landing on Runway 28L (left).

11. The failure of the pilot of 53Q to enter the right traffic pattern, and its positioning, in proximity to the left traffic pattern, resulted in the amendment of its clearance authorizing an approach via the left traffic pattern.

12. When on the downwind leg of the traffic pattern, southeast of the airport, 53Q was cleared to land.

13. At the time 53Q was cleared to land on Runway 28L, its pilot was aware of one large airline transport aircraft, PSA–371, then approaching Runway 28L to land; and another, United 5338, approaching Runway 28R to land.

14. At the time 53Q was cleared to land it was advised of the position of the United 5338, then "on a four mile final".

15. Shortly after being cleared to land 53Q turned to the base leg, northbound, and saw the United aircraft in front of him, westbound, and reported to the controller that he had "him in sight".

16. After turning to the base leg the pilot of 53Q began a slow continual descent, turning towards the runway, and planned to touch down at about the center.

17. At that time he saw the PSA–371 aircraft had landed on Runway 28L, and was still rolling.

18. At no time during the flight and approach of 53Q to the airport did its pilot obtain from available sources any information concerning the wind direction or speed.

19. Available sources of wind direction and speed, other than visual observation, included the ATIS (Airport Traffic Information Service) radio frequency, for recorded information, or by direct radio request to the local (tower) controller.

20. Pilots are urged by the Airman's Information Manual, a publication of the United States, Department of Transportation, Federal Aviation Administration, Part I, Good Operating Practices, to guard (or monitor or listen to) the voice channel of a VOR utilized for ATIS broadcasts.

21. Pilot Clark was aware of the practice to obtain airport information by using the ATIS frequency; or alternatively, the practice of specifically requesting any desired information from the controller.

22. Pilot Clark understood that the purpose of the ATIS service was to relieve the controller of the burden of repetitiously advising each approaching aircraft of airport conditions, and to relieve the communication frequency from congestion.

23. The Airman's Information Manual, Part I, contained a chapter entitled "Safety of Flight" containing information describing "Wake Turbulence", its characteristics and hazards and suggested ways to avoid "vortices" or turbulence generated by large aircraft.

In order to recover it is necessary for plaintiffs to prove by a preponderance of the evidence that an employee of the United States, i. e. the tower controller, was negligent within the scope of his employment, and that his negligence was a proximate cause of the crash—that the United States breached a duty owed to the pilot of the Cessna in question.

Negligence is not the act itself, but the fact which defines the character of the act and makes it a legal wrong— it is the absence of care in the performance of an act. Under California law "Negligence is either the omission of a person (aircraft tower controller) to do something which an ordinarily prudent person (tower controller) would have done under given circumstances, or the doing of something which an ordinarily prudent person (tower controller) would not have done under such circumstances. It is not absolute or to be measured in all cases in accordance with some precise standard, but always relates to some circumstance of time, place and reason.

■ The elements of actionable negligence involve the following: (a) a legal duty to use due care; (b) a breach of such legal duty; (c) the breach as the *proximate* or *legal* cause of the resulting injury.

■ Certain types of persons, or persons engaging in certain types of conduct, are required to exercise a higher degree of care, although this requirement of greater care may be explained in terms of reasonable care under the circumstances. The general test of negligence is foreseeability, that is, conduct is negligent where some unreasonable risk of danger to others would have been foreseen by a reasonable person.

The pilot, McKinley Clark, of 53Q, was an experienced pilot and aircraft mechanic. He first became a pilot in 1923 (flying for forty-six years prior to this accident, held a commercial aviation license with multi-engine land, single engine-sea, Instructor's Certificate, Mechanic's Certificate and Mechanical Aircraft Inspection Authorization). The company by which he was employed based its aircraft at San Francisco International Airport, and Pilot Clark flew in and out of said airport on many occasions and was well acquainted with it.

Pilot Clark testified that he was well acquainted with wake turbulence and had known about this phenomenon for many years, even when it was known as "prop wash". He further testified that he had read and studied wake turbulence on many occasions prior to this accident. He also testified that the Federal Aviation Agency had mailed to him, prior to the accident, a booklet devoted solely to wake turbulence, known as Bulletin 90–23A. (Defendant's Exhibit G–1.) He further stated that he had read and studied said booklet. He stated that he had had personal experience and encounters with wake turbulence, and that in 1956 the following incident occurred on the same runways at San Francisco International Airport. A DC7 was landing on 28R, then swung on to 28L. It was corrected to 28R by the tower, and by the time said aircraft got out of 28L,

the wake turbulence hit the craft piloted by Mr. Clark and turned it over. He also testified that just six months prior to the present accident he had had another wake turbulence encounter at San Francisco Airport. A Mr. Quetnick was at the controls at the time, but Pilot Clark grabbed them and was able to avoid a wake turbulence accident at that time. Mr. Clark stated that his experience with wake turbulence made him aware of the procedure to avoid its encounter, that is with reference to large aircraft he tried to come in high enough to land over their flight path and always tried to land long or past the landing point of such large aircraft.

It is important to note that Clark's testimony further indicates that he was aware of both the United 5338, which had just landed on 28R, and also the PSA–371, which had landed on 28L about two minutes before. He stated that "I was continuously aware of the United Aircraft with reference to its relation to me", and further stated "I saw the PSA–371 on final approach and saw him when he turned off the runway on 27L". With reference to which vortices struck Pilot Clark, he himself testified "I don't know where the vortices came from that struck me, not even which airplane." Therefore, the vortices could have come from the United aircraft or the PSA or both. The testimony of the wake turbulence expert, Ralph Earl Dunham, Jr., indicates that in his opinion the Cessna struck the left vortex of the United and the right vortex of the PSA.

The sum total of all the testimony of Pilot Clark would indicate to the court that Clark was an experienced pilot, well informed of the layout of San Francisco Airport, he had extensive experience with landing at said airport, and was well informed on wake turbulence, both from a research standpoint by reading periodicals, booklets and magazine articles concerning the same, and also by actual personal experience with this wake turbulence phenomena. Also, Mr. Clark was well aware of the procedures necessary in order to avoid wake turbulence and the

disastrous effects when a pilot does not properly adhere to those procedures. The wake turbulence booklet (defendant's Exhibit G–1) which was mailed to Mr. Clark and which he testified he had read and studied prior to the accident, states in part:

"General rule. When it is necessary to operate behind a large, heavy aircraft, try to remain above the flight path of that aircraft. Remember that vortices settle toward the surface and also that they are affected by the wind and move with the air mass down to within a hundred or so feet from the the ground before spreading laterally away from each other, and that the wind will continue to affect the vortex cores until dissipation occurs."

The booklet further states:

"Remember that a large aircraft could have taken off and be out of sight, or landed and be on the ramp, and the vortex turbulence would still be present near the runway."

And lastly:

"Remember, even though a clearance for take-off or landing has been issued, if you believe it is safer to wait, use a different runway, or in some other way alter your intended operation, ask the controller for a revised clearing."

With reference to wind information, Pilot Clark stated that he had had no wind information prior to the landing and that he did not monitor the radio band of the tower which gave out such information. Nor had he turned on the wind ATIS. (Automatic terminal information service.) He testified that he thought the wind velocity at the time of the accident was light and variable, and testified further that light and variable meant, with reference to wind velocity, up to eight knots. However, he further stated that if he had been told by the tower that the wind was seven knots, he would have gone around and not landed at that time.

The air traffic control operator, Mr. Elliot Smith, stated that if he had formed an opinion that an encounter was possible, he would have given the "wake turbulence" warning, as required by the regulations. He stated that based on the last time he observed the Cessna 53Q, in his opinion it would not have encountered wake turbulence had it made a normal approach for landing. Therefore, in the opinion of the tower, had the Cessna flown a normal flight pattern, that is, had it flown above the United to land beyond the United's landing point, there would have been no problem with reference to wake turbulence.

Pilot Clark also stated that he was aware of the fact that the time of the accident was one of the busiest times of the airport traffic day.

The function of avoiding wake turbulence in *VFR conditions* must rest with the pilot, as he is the person who can best do something about it and is in complete control of his aircraft; he is in the best position to observe the aircraft landing before him, as he has a better overall view of the runways, and can better correlate the totality of events with his situation.

The evidence in this case indicates that Pilot Clark did not act as a prudent pilot, considering all the circumstances surrounding the accident, and the burden of proof has not been sustained to prove that the controller was negligent. If the pilot had performed the normal landing procedures necessary under these conditions, i. e. land long and keep his altitude high in order to avoid the wake turbulence path, this accident could have been avoided. The proximate cause of the accident was the negligence of the pilot, not of the controller, who performed the duties he was obligated to perform to this pilot and to the other craft, both landing and taking off.

It is inconceivable that a pilot of a small aircraft landing in the situation of the San Francisco Airport, at the busiest time of its day, with large jets both landing and taking off, could dismiss from his mind the matter of wake turbulence. It seems elementary, not only to those who are expert in the field of flying, such as Pilot Clark in this case, but also

to those who do not have the high degree of piloting expertise, that wake turbulence should have been on the mind of Pilot Clark; especially so, when he saw the prior landing of two large jets, one on his runway and one on the parallel runway, together with the fact that he had experienced wake turbulence personally on prior occasions, one being in the recent past.

██ The pilot of 53Q:

(a) Had a duty to be aware of the hazards of wake turbulence;

(b) Had a duty to be aware of the procedures recommended for avoidance of wake turbulence, and was aware of them;

(c) Had a duty to obtain all available information concerning the flight, including weather and wind information;

(d) Had a duty to comply with authorizations, clearances and instructions of Air Traffic Control; and

(e) Had a duty to operate the aircraft in a careful manner so as not to endanger the life or property of another.

██ If the controller has a reasonable basis to give an advisory, he should give it. If he has no reasonable basis, he should not. The foregoing goes without saying. However, at the time the tower operator gave the Cessna clearance to land, it had no reasonable basis to give the advisory, to wit, the wake turbulence cautionary, and from that point on it was encumbent upon the pilot, the person in command of the aircraft to assume the responsibility for the proper and safe landing of the craft, keeping duly vigilant of the conditions confronting him.

██ The procedures under which air traffic controllers engage in the providing of advice and assistance to pilots do not impose an absolute duty to warn of the hazard of wake turbulence, but rather provide for the discretionary transmission of an advisory, which is wholly secondary to the avoidance responsibility of the pilot.

██ The failure to transmit a discretionary advisory, or warning, to a pilot of the hazard of wake turbulence where the air traffic personnel are fully engaged in the performance of duties having a higher priority, cannot be the proximate or concurring proximate cause of an accident resulting from an encounter with wake turbulence where the pilot knew, or should have known, of the hazards and avoidance procedures, and was on notice and aware of the presence and proximity of generating aircraft.

██ Where the air traffic control personnel had no actual knowledge of the specific vortex, or its whereabouts in relation to 53Q, and were not the creators of the hazard, no warning was required to be given, and such a warning would have been immaterial, if given, to the pilot who was aware of the hazard of wake turbulence in the circumstances of this case.

██ Of the many legal issues presented to the court in this case, the first and foremost is the question of the negligence of the tower operator, and, as stated above, negligence contains within its very scope the question of causation and proximate cause. It is this court's opinion that the tower operator was not negligent in performing his duty as a reasonably prudent operator in command of the total circumstances of the situation, and that the proximate cause of this accident was the sole negligence of the pilot in command of the Cessna 53Q, and that the manner in which he operated and landed his craft was the sole cause of this accident.

The proximate cause of said accident being assigned to the pilot of the Cessna 53Q, and the defendant thereby not being legally responsible for the accident, plaintiffs Sanbutch Properties, Inc. and Gulf Insurance Company are not entitled to recover.

Judgment is rendered in favor of defendant against the plaintiffs, and defendant shall be entitled to its costs.

This Memorandum of Decision will constitute the Findings of Fact and Conclusions of Law in accordance with Rule 52, F.R.Civ.P., provided that the parties

may prepare, serve and lodge with the court, within 20 days from notice of this order, such further Findings or Conclusions, not inconsistent with the views expressed herein, as they deem necessary or advisable. Defendant will also within such time prepare, serve and lodge with the court a form of final judgment in favor of defendant and against plaintiffs on the issue of liability.