**Lorna C. RICHARDSON et al.,
Plaintiffs,**

v.

**UNITED STATES of America,
Defendant.**

**No. C–51806 OJC.**

United States District Court,
N. D. California.

Jan. 3, 1974.

922

J. Adrian Palmquist by Daniel L. Mitchell, Alameda, Cal., for plaintiffs Lorna C. Richardson, Edward G. Richardson, Mrs. Lowell H. Ruff and Lorna C. Richardson as Executrix of the Estate of Marshall G. Richardson.

Sedgwick, Detert, Moran & Arnold by George E. Sayre, San Francisco, Cal., for plaintiff Newark Ins. Co.

Dept. of Justice, by George E. Farrell, Deputy Chief, Civ. Div., Tort Section, Washington, D. C., and James L. Browning, Jr., U. S. Atty., by James A. Bruen, Asst. U. S. Atty., for defendant.

## MEMORANDUM FOR JUDGMENT

OLIVER J. CARTER, Chief Judge.

Plaintiffs have brought a civil action against the United States wherein they allege that Federal Aviation Agency (FAA) tower personnel at San Francisco International Airport negligently failed to provide pilot Marshall G. Richardson with an adequate and timely warning regarding an aeronautical phenomenon known as "wake turbulence" or "wing tip vortices." Richardson was on final approach to the airport and, the plaintiffs allege, as a direct and proximate result of the Tower's failure to warn of the wake turbulence danger, Richardson's aircraft crashed into the San Francisco Bay, killing Richardson and causing damage to the plane itself.

Plaintiffs Lorna C. Richardson, wife of and as executrix of the estate of Marshall G. Richardson, and Mrs. Lowell H. Ruff and Edward G. Richardson, children of the deceased, are suing as the sole surviving heirs for the wrongful death of Marshall G. Richardson. Plaintiff Newark Insurance Company, the hull insurance carrier on the aircraft, has joined in the action as subrogee of the estate of Marshall G. Richardson to recover sums paid in settlement of a claim for damages to the aircraft. Jurisdiction is based upon the Federal Tort Claims Act, 28 U.S.C. § 1346(b), and the law of the State of California is therefore applicable.

## FINDINGS OF FACT

On March 6, 1967 at 1:23 p. m. decedent Marshall G. Richardson, flying a single engine Navion, Registration Number N8760H, contacted the San Francisco Airport Traffic Control Tower (hereinafter referred to as Tower) and requested landing instructions. Richardson at that time stated that he was approximately a mile and a half north of Candlestick Park—a normal entry point into the San Francisco International Airport traffic pattern. The Tower acknowledged Richardson's request and the Navion commenced its downwind approach. At 1:30 p. m. the Tower informed Richardson that he was to follow a TWA Boeing 707 straight in on Runway 28 Right. Decedent acknowledged the Tower's transmission and stated that "we have him [TWA Boeing 707] in sight." The Navion's last transmission occurred at 1:32 p. m. when, in response to the Tower's query as to "how far out" the Navion was, Richardson indicated that he was a mile and a half behind the Boeing and had passed Coyote Point. Thirty seconds later the TWA jet had completed its landing and began to taxi to the terminal. At 1:33 p. m. the Navion was cleared to land and a wake turbulence advisory was given by the Tower.[1] The Navion did not respond to this transmission.

From the evidence introduced at trial, it appears extremely likely that the Navion Richardson was flying was caught in the wake turbulence generated by the TWA Boeing 707 it was following. As a result of being caught therein, Richard-

---

1. The wake turbulence advisory consisted of the following: "Navion six zero hotel cleared to land two eight right, caution wake turbulence from the TWA just landed and then long landing if you wish. Wind zero six zero degrees at four."

son lost control of the aircraft and was killed when the Navion crashed into San Francisco Bay approximately one half mile from the threshold of Runway 28 Right.

Wake turbulence is a phenomenon about which there existed some controversy in 1967. The aerodynamic characteristics of the phenomenon had not (and apparently still have not) been ascertained to a particularly high degree of certainty.[2] Disputes as to intensity, duration, and causation have been common.[3] However, wake turbulence can be generally described as that force generated by the aircraft's air foil [4] as it passes through a mass of air and thereby creates lift. Each wing of the aircraft leaves behind the trailing edge a continuous sheet of unstable air. The uneven flow of air (spillage) around the wing tip forces the unstable air to roll into two distinct vortices—i. e., funnel shaped masses of air currents moving in a circular fashion—trailing behind and below each tip. The vortices rotate in opposite directions and always settle towards the ground. At a height determined by the mass of the aircraft and the length of its wing, the vortices separate laterally and continue to move apart from each other until they strike the ground and are dissipated. The wind can have a great effect on the vortices, assisting movement in one direction, retarding movement in another.

Large aircraft during take-off and landing present the greatest wake turbulence danger since at these points they are creating greater lift forces while simultaneously traveling at relatively slower speeds. Light aircraft such as the Navion must be particularly alert when landing or taking off in the vicinity of large aircraft such as the TWA Boeing 707.

The Navion conducted its approach at an altitude greatly below the descent path of the preceding Boeing. Flying in such a position placed the Navion squarely within the zone of danger created by wake turbulence since, as noted above, the vortices descend and never ascend. Accordingly, the safest and most effective method of avoiding wake turbulence would have been to maintain an altitude above the descent path of the preceding aircraft and "landing long." [5] There existed no conditions at the time of the accident that would have prevented the Navion from either maintaining a higher altitude or effecting a long landing. The above-described procedure for avoiding wake turbulence is essential knowledge for any pilot operating around large airports. Richardson knew, or should have known, of the procedure and, had he utilized it, the Navion would not have encountered the wake turbulence generated by the Boeing 707.

The weather at the time of the accident was hazy, with approximately seven miles visibility. Accordingly, the approach was conducted pursuant to Visual Flight Rules (VFR). Under VFR, the pilot is responsible for selecting the altitude, speed, course, and separation [6] of

2. The ATC Procedures Manual at 410.6 notes that "since the existence and effect of [wake] turbulence is unpredictable, the controller is not responsible for anticipating in all cases the need for such information."

3. The government's wake turbulence expert indicated several discrepancies between information that had been disseminated to pilots and the results of his own tests. Additionally, the expert stated that he has had to revise some of his own theories due to new developments in wake turbulence research.

4. The wing is shaped in such a manner so as to create a pressure differential between the top of the wing and the bottom of the wing.

Since there exists a lower pressure on the top of the wing, an upward force (lift) is created thereby allowing the aircraft to fly.

5. Landing long merely describes a common procedure whereby the trailing aircraft lands at a point beyond the touchdown point of the preceding aircraft. Since wake turbulence is not generated by an aircraft on the ground, the trailing aircraft will never encounter wake turbulence since it is always above or beyond the vortices.

6. Separation is defined as the "spacing of aircraft to achieve their safe and orderly movement in flight and while landing and taking off." ATC Procedures Manual 221.1.

his aircraft. Thus the Tower was responsible for sequencing—*i. e.*, informing the Navion that he was to land after the TWA Boeing 707—but Richardson himself had the responsibility for selecting the altitude, course, and speed at which he would land his aircraft behind the 707.

The Air Traffic Controller at the time of the accident was Charles E. Henson, an ATC with over thirteen years of experience. Mr. Henson, an employee of the FAA, had no reason to suspect that the Navion was being flown by anyone other than an experienced and competent pilot. At no time during final approach did Henson or other Tower personnel have the Navion visually sighted. A radar scope was utilized by Tower personnel to assist visual control, and although at various times the Tower had a fix on the Navion, the radar was incapable of indicating altitude. Richardson never, during the period he was on final approach, indicated his altitude and, accordingly, the Tower was not aware of the dangerous altitude at which the Navion was flying.

Mr. Henson was aware of the existence of the wake turbulence phenomenon and the procedures available to avoid it. As noted, above, however, he did not have knowledge that the Navion was flying at an altitude beneath that of the 707, nor did he have reason to suspect that the Navion would be flying at such an altitude. Accordingly, Henson gave the wake turbulence warning to the Navion along with the landing instructions, as is the policy at San Francisco International Airport and many other major airports.

Marshall G. Richardson was the owner of the Navion and utilized the aircraft primarily for business purposes. The aircraft was in good condition and there existed no known malfunction that contributed to the fatal accident.

Richardson was fifty-nine years old at the time of the accident, was in good physical health, and was a conscientious and careful pilot. Decedent began flying in 1927; however he quit in 1932 and did not begin flying again until 1953. At the time of the accident Richardson had been flying continuously since 1953, held a private pilot's license, and had approximately 2831 hours pilot time. Richardson had flown into San Francisco International Airport and similar large airports on numerous occasions and was a pilot who maintained an active awareness of new developments in aviation and aviation safety.

CONCLUSIONS OF LAW

Those negligence cases dealing with the respective duties of pilot and tower personnel are frequently plagued with what seems to be a paradox. The Air Traffic Controller (ATC) must perform certain functions necessary to the maintenance of a high degree of aviation safety, yet the pilot is burdened with the ultimate responsibility for the prudent handling of his aircraft. To unravel the threads of concurrent responsibility and determine which of the parties—Richardson, the pilot or Henson, the ATC —has the ultimate duty regarding the wake turbulence danger is the primary issue with which the Court is confronted. Plaintiffs maintain that the ATC's wake turbulence advisory, which the FAA employee was obligated to provide, was obviously inadequate since at the time it was transmitted the Navion had already crashed into the Bay. Defendant argues that the fatal crash occurred, not because of the ATC's failure to give a timely warning, but solely due to the unsafe altitude at which the pilot was flying.

■■ The interrelationship existing between pilot and ground personnel can best be characterized as one requiring extensive cooperation. The pilot is in command of his aircraft and is directly responsible for its operation. *Spaulding v. United States*, 455 F.2d 222 (9th Cir. 1972). However, before he may be held legally responsible for his aircraft, the pilot must be supplied with those pertinent facts that he is not in a position to ascertain for himself. Accordingly, the Air Traffic Controllers are under a duty

to provide certain information and warnings to the pilot so that he has the opportunity to make a competent decision as to the operation of his aircraft. Spaulding v. United States, *supra*. Thus the key element in distinguishing the respective duties of pilot and ATC relates to the ability of the former to perceive a potential danger without assistance from the latter. As a result, a balancing process is involved—the vantage point of the pilot will be weighed against the Tower's superior knowledge or awareness of the pilot's danger. The cases discussed below will demonstrate this balancing process in a proper perspective.

■■ Plaintiffs anchor their claim that the ATC was under a duty to issue a timely wake turbulence warning in the Air Traffic Control Procedures Manual [7] (Manual), Paragraph 410.6 which states: "Issue cautionary information to aircraft concerned, if you foresee the possibility of wake turbulence from aircraft having an adverse effect on another aircraft." That it was incumbent upon the ATC to issue such a warning in those circumstances delineated in the Manual cannot be gainsaid. See, *e. g.*, Lightenburger v. United States, 460 F. 2d 391 (9th Cir. 1972). However, the plaintiffs must establish that Henson unreasonably failed to foresee the possibility of wake turbulence having an adverse effect on the Navion and thereby did not issue the prescribed advisory in a timely fashion. This they have not accomplished.

The testimony at the trial established that Richardson was a knowledgeable pilot who knew, or should have known, of the dangers arising from wake turbulence and the procedures for avoiding them. Indeed, it has been specifically held as a matter of law that a reasonable pilot, upon being informed that he was to follow a large jet in on approach, would fly at an altitude above the descent path of the preceding aircraft. Sanbutch Properties, Inc. v. United States, 343 F.Supp. 611, 616 (N.D.Cal. 1972). The ATC Henson would thus expect, absent some indication to the contrary, a prudent pilot to fly at such an altitude. Henson testified that there existed no factor which would have alerted him to the fact that the pilot of the Navion was inexperienced or was not aware of the position of the aircraft he was following. The evidence supports Henson's contention that there existed nothing to alert the Tower to the fact that Richardson was piloting his aircraft in an unsafe and unexpected manner.[8]

■ The eyewitness testimony of several witnesses, one an experienced commercial pilot, in fact established that Richardson was flying at an unreasonably low altitude and was far beneath the descent path of the Boeing 707. Had Henson known that Richardson was in such a dangerous position or had some indication been provided that he should have known, there may have existed a duty to issue an earlier wake turbulence advisory. See, *e. g.*, United States v. Furumizo, 381 F.2d 965 (9th Cir. 1967) where a wake turbulence advisory had been issued but the pilot ignored it and, in full view of the tower, attempted to take-off anyway. The court held that, since the controllers were aware of the extreme danger to the aircraft, they had a duty to act—even though they had complied with the technical requisites of the Manual.

Plaintiffs contend that the ATC Henson actually placed Richardson in a position of danger—instead of merely

---

7. The ATC Procedures Manual "prescribes procedures and accompanying phraseology to be used by personnel of all facilities providing air traffic control service." Forward, ATC Procedures Manual. The ATC is required to provide the information and warnings specified in the Manual. Spaulding v. United States, *supra* at 226.

8. Plaintiffs have failed to prove that the Navion was visually sighted by the Tower during its final approach. Additionally, the radar was not capable of indicating altitude and Richardson did not indicate his altitude to the Tower during the critical time period. Thus the Court concludes that the Tower was not aware of the dangerous altitude at which the aircraft was flying.

watching—and thus the negligence involved in the instant case actually exceeds that involved in *Furumizo*. This argument, however, ignores the fact that, under VFR conditions, it was Richardson, not tower personnel, who was responsible for the selection and maintenance of the altitude, separation, and course of the aircraft. United States v. Wiener, 335 F.2d 379 (9th Cir. 1964), cert. denied 379 U.S. 951, 85 S.Ct. 452, 13 L.Ed.2d 549 (1965); United States v. Miller, 303 F.2d 703 (9th Cir. 1962), cert. denied 371 U.S. 955, 83 S.Ct. 507, 9 L.Ed.2d 502 (1963). The only "command" the Tower provided related to the sequencing. Accordingly, it was Richardson himself who voluntarily and unaccountably maintained a dangerous altitude and thus exposed himself to a very serious wake turbulence danger.

The lesson of *Furumizo* was repeated in Hartz v. United States, 387 F.2d 870 (5th Cir. 1968) where an important factor in determining liability was the superior vantage point of the ATC in relation to the pilot awaiting take-off directions. Tower personnel were again in a position to be aware of the danger to the aircraft and failed to assist a pilot whom they knew to be flying into trouble.

The balance of concurrent responsibilities was delineated in the *Sanbutch* case mentioned above. The court stated that "the function of avoiding wake turbulence in VFR conditions must rest with the pilot, as he is the person who can best do something about it and is in complete control of his aircraft; he is in the best position to observe the aircraft landing before him, as he has a better overall view of the runways, and can better correlate the totality of events with his situation." *Sanbutch Properties, Inc., supra*, 343 F.Supp. at 615.

The *Sanbutch* case stresses the point that the failure to provide a wake turbulence advisory cannot be the proximate cause of an accident resulting from wake turbulence when the pilot knew or should have known of the hazards and the procedures designed to avoid them. "Where the air traffic control personnel had no actual knowledge of the specific vortex, or its whereabouts . . . ., and were not the creators of the hazard, no warning was required to be given, and such a warning would have been immaterial, if given, to the pilot who was aware of the hazard of wake turbulence in the circumstances of this case." *Sanbutch, supra* at 616.

The foreseeability of a wake turbulence encounter was the essential consideration in Lightenburger v. United States, *supra*. Since the evidence in that case established that the possibility of wake turbulence after twelve minutes was unforeseeable, there existed no duty on the part of the ATC to issue the wake turbulence advisory. Similarly, in the instant case, the fact that Richardson was at an altitude most likely to encounter wake turbulence is an unforeseeable fact for which the ATC cannot be charged with the responsibility.

The cases discussed above all demonstrate that the decision to issue the wake turbulence warning depends upon the judgment of the ATC. In the case at bar, the ATC issued the warning at the time he believed the "adverse effect" from wake turbulence to arise—when landing instructions were provided and the Navion was likely to intersect the flight path of the preceding Boeing 707. The policy of issuing the advisory at such a time—absent countervailing circumstances—is not unreasonable and is the custom at many large airports. This Court will not "second guess" the judgment of the ATC merely because a tragic accident happened to result due to wake turbulence. Since there exists no evidence that the ATC utilized anything but reasonable judgment, the warning he provided must be considered timely.

The proximate cause of the accident was thus the carelessness of the pilot himself. The altitude at which he was flying at the time of the crash was in total disregard of the wake turbu-

928

lence danger and prudent flying practices. Accordingly, the defendant is not responsible for the accident and plaintiffs Lorna C. Richardson, Mrs. Lowell H. Ruff, Edward G. Richardson, and Newark Insurance Company are not entitled to recover. The sole and proximate cause of the fatal accident being the actions of the decedent, the Court need not consider the issues of contributory negligence and last clear chance raised by the parties.

Accordingly, it is ordered that judgment be, and the same is, hereby rendered against plaintiffs, and defendant shall be entitled to its costs.

It is further ordered that this Memorandum will constitute the Findings of Fact and Conclusions of Law in accordance with Fed.R.Civ.P. 52. Defendant will within twenty days from notice of this order prepare, serve and lodge with the Court a form of final judgment in favor of defendant and against plaintiffs on the issue of liability.