**NEW HAMPSHIRE INSURANCE CO., Plaintiff,**

**v.**

**UNITED STATES of America, Defendant.**

**Nicholas APOSTOL, Plaintiff,**

**v.**

**UNITED STATES of America, Defendant.**

**Civ. Nos. 83–1732, 83–1733 (JAF).**

United States District Court,
D. Puerto Rico.

Aug. 13, 1986.

Wilfredo A. Géigel, Santurce, P.R., Fernando L. Gallardo-Aramburu, Woods & Woods, Hato Rey, P.R., for plaintiff.

Richard R. Stone, Sr., Trial Atty., Torts Branch, Civ. Div., Richard K. Willard, Asst. Atty. Gen., Daniel F. Lopez-Romo, U.S. Atty., Wanda Rubianes, Asst. U.S. Atty., Curtis J. Wilder, Office of Chief Counsel, F.A.A., U.S. Dept. of Justice, Washington, D.C., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND JUDGMENT

FUSTE, District Judge.

This case was tried before the court on August 4–5, 1986. The same involves a Federal Tort Claims Act complaint, 28 U.S.C. Sec. 2474. Jurisdiction exists pursuant to 28 U.S.C. Sec. 1346. The plaintiffs

are Nicholas Apostol and New Hampshire Insurance Company. On July 20, 1981, Apostol was piloting a Dorado Wings, Inc. twin-engine Britten-Norman BM–4 aircraft which crashed attempting to take off from Runway 7, San Juan International Airport. Apostol, the President of Dorado Wings, was transporting company personnel and mechanics to their base at Dorado Airport, Dorado, Puerto Rico, when the crash occurred. He suffered bodily injury, and claims mental anguish, as well as pecuniary losses. He was suspended as an FAA-licensed, commercial pilot. Pretrial Order filed July 14, 1985, Docket Document No. 83 at 5. Plaintiff New Hampshire Insurance Company stands in subrogation as insurer of Dorado Wings, Inc. The insurance company paid to Dorado Wings, Inc. the amount of $188,000 for the loss suffered. The other occupants of the airplane settled their respective claims prior to trial.

Plaintiffs claim negligence from the Air Traffic Control Tower in dealing with aircraft separation upon departure. Wake turbulence generated by a departing Lockheed 1011, operated by Pan American World Airways, is claimed as being the direct cause of the accident. After having received the evidence on the issue of liability, we find for defendant. Accordingly, its well-preserved motion to dismiss under Fed.R.Civ.P. 41(b) shall be granted. We enter our findings and conclusions as required by Fed.R.Civ.P. 52(a). In so doing, we will discuss the wake turbulence phenomenon and its impact on light aircraft. We will also discuss the principles behind airplane stalls, inasmuch as the government claims, and indeed proved by preponderance of the evidence, that a stall was the cause of the accident. We will then state the facts as found and the applicable law to this particular situation.

## Wake Turbulence

Of special concern to pilots of light aircraft is the turbulence which is generated by large aircraft operating in the vicinity of airports. The greatest danger from heavy aircraft turbulence is the effect of wing tip vortices. These vortices are the result of high-pressure air under the wings, spilling around and over the wing tips, to equalize the low pressure area above the upper wing surface. If one could actually see the vortices generated by the wings, they would appear as twin, horizontal tornadoes originating at the wing tips.

These rotating cones of air are created as a result of the generation of lift by the wings of the aircraft. Experts Bertin and Hallock coincide in that the intensity of this turbulence is directly related to the wing span, weight, forward speed of the departing heavy aircraft, and density of the air (density relates up to a certain point on airport altitude, temperature, and other weather-related conditions). In general, the slower the speed of the heavy departing aircraft, the shorter the wing span, and the greater the weight, the greater will be the velocity of the air in the vortices generated by the heavy aircraft. The greatest turbulence is generated by a large aircraft such as PAA 455, Lockheed 1011, when they fly slowly at a high angle of attack. *This condition primarily exists* during takeoff, climbout, and landing. In this case, PAA 455 departed before Dorado Wings DW–16.

The expert evidence shows that vortex core velocities may be quite high immediately behind a heavy jet which is flying very slowly as in takeoff and while climbing. At cruise speeds, since the air speed is highest and the aircraft weight is spread over the greatest amount of air, the turbulence created is at minimum for said aircraft. Conversely, when the aircraft is on the ground, the wings are not supporting the weight of the aircraft and, thus, *vortex cores of significance* are not generated. Prior to lift-off (rotation) or after touchdown when landing, wing-tip vortices are almost nonexistent. Government's Exhibit A, DOT Advisory Circular AC–90–23D, Dec. 15, 1972. *See* Illustration # 1, taken from the Airman's Information Manual, DOT, July 1981 ed., pp. 172–177, Government's Exhibit B, appended to these findings.

A wake encounter is not necessarily hazardous. Of course, if the small aircraft encounters the vortices while flying in alignment with the flight path of the generating aircraft, then the problem may become critical and an induced roll can occur. Airman's Information Manual, Government's Exhibit B, at 173.

Since plaintiffs claim that wake turbulence and air traffic control negligence was the cause of the accident, we will outline some common-sense rules for takeoff behind a large aircraft which can be considered basic procedures for operating near wake turbulence. These precautions or procedures were to be observed by any aircraft such as DW–16 when taking off behind a heavy, large jet, irrespective of whether air traffic control was in operation at the time. The takeoff roll by DW–16 was to be started from the same point as the large aircraft to ensure lift-off ahead of the large aircraft's point of takeoff. This was done by plaintiff Apostol. His climbout was to be above or to the upwind side of the large aircraft's flight path to avoid potential turbulence. Since both the heavy jet and the DW–16 were taking off from San Juan International Airport's Runway 7 (magnetic orientation 70 degrees, almost facing East), and since the wind was coming from direction 150 degrees more or less, at about 6 knots, Illustration No. 2, appended to these findings, explains the point that we have made.

The Airman's Information Manual, Government's Exhibit B, Sec. 3, entitled "Wake Turbulence", pp. 172–177, at 176, gives specific directives to pilots. When departing behind a large aircraft, the pilot of the light airplane should note the large aircraft's rotation point. The purpose is to have the light aircraft following on takeoff rotate prior to the large aircraft's rotation point. The light aircraft is to continue the climb above and stay upwind of the large aircraft's climb path until turning clear of its way. The light aircraft should avoid headings which will cross below *and* behind the large, heavy aircraft. In this particular case, as the evidence demonstrated, the Pan American Lockheed 1011, flight 455, took off from the beginning of Runway 7 (threshold area) and most probably rotated between 3,800 and 5,000 feet down the runway. The DW–16, piloted by plaintiff Apostol, took off from the same point as the large, heavy jet. His takeoff run would not be more than 800 feet until he would be airborne. Therefore, it would be expected that DW–16 would rotate for takeoff way behind the rotation point of PAA 455 without violating the common-sense rules which we have mentioned herein.

The Air Traffic Control Manual in effect at the time of the occurrence, plaintiffs' Exhibit 1, gave Air Traffic Controller Sandra Prieto, the necessary guidelines to follow in aircraft departure separation. *See* plaintiffs' Exhibit 1, Chapter 6, at 173–178. Item 1400, at 173, states that the procedures regarding wake turbulence are to be applied to aircraft operating behind heavy jets and, when indicated, to small aircraft behind large aircraft. Item 1426 states that the air traffic controller should separate a heavy jet taking off from a departing light aircraft taking off behind the heavy jet by two minutes. Item 1426(a) specifically states that the takeoff clearance to the following aircraft, in this case DW–16, should not be issued until two minutes after the heavy jet begins the takeoff roll on the same runway. Whenever in the opinion of the air traffic controller the operation of a light aircraft may be affected by wake turbulence, the control tower should so advise the pilots by simply giving the corresponding clearances, utilizing the phraseology CAUTION, WAKE TURBULENCE in the proper context, depending on the circumstances. The Airman's Information Manual states at page 176, para. 551, that government and industry groups are always making concerted efforts to minimize or eliminate the hazards of trailing vortices. However, the flight disciplines necessary to assure vortex avoidance during visual flight rules (VFR) operations like the ones applicable to DW–16 on the night of the accident, must be exercised by the pilot. Vortex visualization and avoid-

ance procedures should be exercised by the pilot using the same degree of concern as in collision avoidance. Pilots such as Nicholas Apostol knew that in operations conducted behind all aircraft, acceptance of instructions by air traffic control when instructed to follow an aircraft, is an acknowledgement that the pilot will ensure safe takeoff and landing intervals and that he accepts the responsibility of providing his own wake turbulence separation. *See* Government's Exhibit B, para. 551(c)(2) at 176.

As stated before, plaintiffs claim that the Air Traffic Control Tower was negligent in so advising and that the negligence of the Air Traffic Control Tower was the main contributing cause to DW–16 allegedly having crashed because of its encounter with the wake turbulence generated by PAA 455, the heavy Lockheed 1011 which departed ahead of DW–16. The government's theory of the case is to the effect that there was no violation of the Air Traffic Control Manual by air traffic controller Sandra Prieto and that an airplane stall and not wake turbulence was the cause of the accident.

### The Stall and its Cause

An aircraft in flight is acted upon by four forces, lift, gravity, thrust, and drag. Lift is the upward acting force. Gravity or wake is the downward acting force. Thrust acts in a forward direction, and drag is the backward, or retarding force, produced by air resistance. When an aircraft is in straight and level flight, at a constant air speed, the opposing forces balance each other. Lift equals wake and thrust equals drag. Any inequality between thrust and drag while maintaining straight and level flight will result in acceleration or deceleration until the two forces again become balanced. When an airplane is lifting on takeoff, and because the path of the relative wind over the top of the wing is more curved than that beneath the wing, air flowing above the wing will be accelerated more than air flowing beneath the wing. As a result, the reduction in air pressure above the wing will be greater than the pressure reduction along the lower wing surface. This difference of pressure accounts for the upward force called lift. At high wing angles of attack, an additional force is derived from the impact of air against the lower surface of the wing because it is inclined to the relative wind. Even at high angles of attack, the lift generated by the impact of air on the bottom surface of the wing amounts only to a fraction of the lifting force needed to sustain the aircraft in flight. Most of the lift is caused by the lower pressure above the airfoil or wing. The wing is not so much pushed up from below by excess pressure as pulled up from above by the lower pressure. Lift can be increased in two ways, by increasing the forward speed of the airplane or by increasing the angle of attack. The pilot can increase the forward speed of the aircraft by applying more power. This increases the speed of the relative wind over the airfoil or wing.

Increasing the angle of attack, we increase lift up to a point. As the airfoil or wing is inclined, the air flowing over the top of the airfoil is diverted over a greater distance resulting in an even greater increase in air velocity and lift. However, as the airfoil is given a greater angle of attack relative to the oncoming air, it becomes more difficult for the air to flow smoothly across the top of the wing. Thus, it starts to separate from the wing and enters a burbling or turbulent pattern. The angle at which airflow separation and turbulence occur on the upper wing surface is called the critical angle of attack. This turbulence results in a loss of lift in the area of the wing where it is taking place.

The separation point starts near the trailing edge of the wing and progresses forward as the angle of attack is increased. Finally, the separation point moves so far forward that most of the wing loses its lift and a stall condition occurs. A stall is nothing else but a loss of lifting power when the wing exceeds the critical angle of attack. The airplane's controls become mushy and simply the airplane fails to fly further. If the pilot does not properly re-

cover from the stall, control is lost and a crash is inevitable.

There are several factors affecting the stall speed, such as gross weight, the use of flaps, the angle of bank, the center of gravity, location and weight distribution of the airplane, the load factor, weather-related conditions such as floods, snow, and ice accumulation on the wing surface, and wind factors which may cause wind turbulence. As it pertains to this case, the most important is the angle-of-bank factor, inasmuch as DW–16, upon takeoff, was cleared to do a left or downwind turn so as to head West towards its destination, Dorado, Puerto Rico. The evidence received is to the effect that Nicholas Apostol, upon rotation, increased the angle of attack up to the critical angle of attack. The aircraft's alarm systems gave him the warnings by sound and light that a stall could occur and that he was losing lifting power. Our appraisal of the evidence is to the effect that this happened while Mr. Apostol was banking to the left immediately after takeoff. There is a direct relationship between angle of bank and stall speed in the sense that there is a progressive increase in stalling speed as the angle of bank is increased. The stalling speed increases due to the additional load factor or weight supported by the wing. As the load factor increases, the total lift must also increase to maintain a flight path. This additional lift is generated by increasing the angle of attack. Therefore, in a turn as the one initiated by Mr. Apostol, the critical or stall angle of attack is reached at a higher air speed than in level flight.

Some persons believe that stalls occur only at relatively low air speeds. However, this is not true. An airplane can be stalled at any air speed. All that is necessary is to exceed the critical angle of attack. This can be done at any air speed if the pilot exercises abrupt or excessive back pressure on the elevator control. Another misconcept is that it is necessary for the airplane to have a relatively-high pitch altitude in order for it to stall. An airplane can be stalled in any attitude, level, banked, or even inverted. Again, all that is necessary is to exceed the critical angle of attack.

When the wing stalls, the airplane descends, since insufficient lift is being generated to hold the aircraft aloft. The pilot can recover from a stall condition by one of two methods: (1) lower the nose of the aircraft. This decreases the angle of attack and allows the airflow over the wing to smooth out again so that the wing can continue to generate lift; (2) accelerating the aircraft. This is done by the application of more engine power. However, if the aircraft is moving under full power when the stall occurs, the only way to recover is to lower the nose. To hold the airfoil or wing in a particular position, an external aerodynamic force is required. Through the use of elevators, the pilot controls the angle of attack by holding the surface of the elevator in the position that causes the airflow over the tail surface to exert the required amount of force to hold the wings in the desired altitude. Elevators have trim tabs which can be adjusted to assist the pilot in controlling the elevator and its use. In a power-on stall, it is a mortal sin to take away power from the engines. This simply enhances the stall configuration.

### The Facts

The San Juan International Airport has two runways and one control tower. Runways are identified as 7 and 10, meaning that they face magnetic bearings 70 degrees and 100 degrees for out-bound traffic. Basically, the two runways are oriented in an easterly direction. Runway 7 was the one used by the aircraft involved in this accident. The control tower is located in the airport's main building, between the two runways.

Runway 7 is 10,000 feet long. For normal departures from runway 7, pilots gain access to the active runway 7 by using the taxiways. DW–16 used the North-South taxiway and turned left in front of the North ramp up to intersection Y (Yankee) in order to make full use of the runway. At 0958:30 P.M., local time, San Juan tower

cleared PAA Lockheed 1011, a heavy jet, hereinafter referred to as PAA 455, to taxi from the terminal to runway 7 for departure. PAA 455 was cleared for takeoff at 1001:38 P.M., local time. The PAA 455 pilot acknowledged the clearance at 1001:44 P.M.

At 1002:35 P.M., Nicholas Apostol, pilot in command of DW–16, requested permission to fly visual flight rules (VFR) westbound to Dorado. At 1002:43 P.M., the clearance was granted, with instructions to hold short of the North-South taxiway, a place in front of the Prinair facility, as depicted in plaintiffs' Exhibit 4. Apostol did not seem to understand the taxiing clearance. At 1002:50 P.M., DW–16 acknowledged having understood that he had been given a clearance to taxi to runway 7 on the outside taxiway. The controller, Sandra Prieto, immediately corrected the instruction and, at 1002:53 P.M., told Apostol: "Negative, hold short of the North-South taxiway."

At 1003:16 P.M., PAA 455 informed the tower that they were rolling on runway 7. At 1003:42 P.M., Apostol was cleared to taxi to runway 7. His testimony is to the effect that as he proceeded to taxi from the point he was holding, he could see the heavy PAA jet rolling down the runway. He does not recall details of when the heavy jet rotated on actual lift-off.

At 1003:58 P.M., Apostol and DW–16 were instructed to taxi full length (referring to full length of runway 7), inasmuch as a heavy jet was departing. At 1004:00 P.M., Apostol acknowledged that specific instruction.

The evidence shows that by 1004:15, PAA 455 was airborne and was cleared to execute a right turn, in order to join an Instrument Flight Rules (IFR) route nine. At 1004:22, the PAA jet was well away of the area. Frequency change to departure control was approved. At 1004:24, PAA 455 was not a concern to San Juan tower.

Going back to DW–16, at 1006:14, San Juan tower cleared the aircraft for takeoff. The following warning was given: "Dorado Wings sixteen caution wake turbulence from the heavy jet that departed wind one five zero (meaning blowing from 150 degrees) at six (meaning knots) cleared for takeoff."

At 1006:22, Nicholas Apostol acknowledged the clearance. At 1006:23, a left downwind departure was approved. At 1006:31, the air traffic controller turned her attention to traffic in runway 10. A Prinair aircraft had just landed.

At 1007:09, an ELT[1] signal was perceived in the tower. Since the controller had not seen the Dorado Wings airplane crash, and since ELT's give false emergencies quite often, the air traffic controller did not suspect that an accident had occurred. At 1009:15, the air traffic controller, having picked up an ELT signal, attempted contact with DW–16. The same occurred on 1009:38. At 1009:53, the San Juan Flight Service Station also picked up the ELT signal. They contacted the tower to inquire. FSS was picking up the signal on frequency 243.00. Both the tower and FSS suspected a military aircraft as being the source of the ELT transmission. At 1011:48, the tower once again attempted contact with DW–16. No response was received and, above all, no input from anybody at the airport ramp had been received as to the fact that DW–16 had crashed some 1800–1900 feet down on the grass on the left side of runway 7. At 1017.26, controller Sandra Prieto still was at a loss. Nobody had seen the downed aircraft. She contacted the Flight Service Station to inquire whether DW–16 had activated a flight plan for the short hop to Dorado. FSS checked and a negative response was issued.

At 1018:00, not one person at San Juan International Airport had noticed anything out of the ordinary. Be it remembered that personnel working on the ramps were

1. An ELT, Emergency Locator Transmitter, is a device that is installed in aircrafts to assist in locating airplane wreckages. Upon impact, the ELT of a downed aircraft emits signals on frequency 121.5 MHz or 243.00 MHz. Usually civil aircraft use 121.5. Military aircraft use 243.00.

simply across the runway. The night was dark. The accident had gone unnoticed. Controller Sandra Prieto still was concerned. She mentioned to "Frank" that ever since the "guy" departed (referring to DW–16), it was a very big coincidence that an ELT signal was being received and DW–16 could not be seen on the radarscope. At 1022:03, while Eastern 928 was departing from the ramp, its powerful landing lights illuminated the area where DW–16 had crashed.

We find that the PAA 455 heavy jet began its takeoff roll on or about 1003:16 P.M. On said occasion, the Pan Am pilot informed the tower "we're rolling on 'uh' runway seven. . . ." We further find that some seconds after 1006:22, as confirmed by DW–16, the small aircraft piloted by Mr. Apostol commenced its takeoff roll. Both aircraft were separated by 3 minutes and 5 seconds on departure. Non-radar separation departure minima as per Air Traffic Control Manual, plaintiffs' Exhibit 1, item 1426, 1426(a), only required a two-minute separation. Takeoff clearance to DW–16 was not issued until more than two minutes had elapsed after the heavy jet began its takeoff roll on the same runway 7.

We decline plaintiffs' invitation to accept that DW–16's takeoff was an intersection takeoff subject to somewhat different air traffic control directives. See Air Traffic Control Manual, plaintiffs' Exhibit 1, Intersection Takeoff Separation, item 1113, at 146. The so-called intersection Y (Yankee) at the end of runway 7, along with intersection Z (Zulu) at the very end of the runway, only permit full runway length takeoff from runway 7's threshold. We cannot ignore a factual reality which is well known and which cannot be the subject of reasonable dispute. This fact is known within the aviation circles to which all parties to this litigation belong. Furthermore, it is a fact capable of accurate and ready determination by resort to resources whose accuracy cannot be reasonably questioned. See plaintiffs' Exhibit 4; Fed.R.Evid. 201. The

presiding judge, being an FAA-licensed pilot, cannot accept this bold invitation unless we are willing to define intersection takeoff as being one made from the intersection of any taxiway into the active runway. Both intersections Yankee and Zulu are less than 500 feet from the runway's threshold. By virtue of section 230 of the Airman's Information Manual, government's Exhibit B at 71, and the Air Traffic Control Manual, plaintiffs' Exhibit 1, app. 4 at 22, an intersection, and, thus, an intersection takeoff, is one from a point where two runways cross or two taxiways cross. Intersection takeoffs are utilized to enhance airport capacities, reduce taxiing distances, minimize departure delays, and provide for more efficient movement of air traffic. Intersection takeoffs, distinguished from full-length runway takeoffs, are initiated by air traffic control or specifically requested as such by the pilot. Here, we do have specific evidence that Mr. Apostol was going to make a full runway-length takeoff. The transcript of voice recordings, Air Traffic Control, plaintiffs' Exhibit 2, so confirms: "0203:58 [2] SJU TWR LC Dorado sixteen taxi full length heavy jet departing."

We further find that the only intersection takeoffs that can be made by a small commuter aircraft such as DW–16 which approaches runway 7 from the North-South taxiway, is at intersection W (Whiskey), located in front of the central ramp. This is not the case as it pertains to DW–16.

The court further finds from the testimony of Dr. James N. Hallock, to whom we give full credibility, that it was a physical impossibility for DW–16 to encounter wake turbulence when it rolled on takeoff for some 600 to 800 feet before rotating on takeoff. The vortices were simply not there by the time DW–16 made use of the first 600 to 800 feet of runway. Wake turbulence could be avoided by pilot Apostol. More so, wake turbulence was not a factor in this accident. Air traffic control negligence as it relates to wake turbulence

2. The transcript of tower communications is kept in Greenwich Meridian Time (GMT). In order to convert GMT to local time, we simply subtract four hours.

simply is nonexistent. *See* Airman's Information Manual, government's Exhibit B, sec. 3, Wake Turbulence, at 172–177 (July 1981 ed.), and Air Traffic Control Manual, plaintiffs' Exhibit 1, ch. 6, Wake Turbulence, at 173–178.

The court further finds that there is no negligence and/or causal connection with claimed damages on the part of the government in the air traffic controller not discovering that DW–16 had crashed until the Eastern pilot lighted the area some sixteen minutes after the ELT was activated. An ELT signal does not identify the exact location of a downed aircraft. It simply allows rescue operations to home in on the signal to find the wreck. Furthermore, ELT's are known to give false indications. The fact remains that in this case not a soul in the airport learned of the accident or saw the accident occur until Eastern's 928 powerful landing lights discovered the downed aircraft. Of importance in this sense is the fact that the National Transportation Safety Board's investigation, plaintiffs' Exhibit 3, discovered that DW–16 was using minimum lighting upon takeoff. The wreckage's investigation demonstrated that DW–16, after crashing, had its circuit breakers in and set, but its battery, generators, landing lights, strobe lights, and passenger notice lights, were off. Only the small red, green, and white navigation lights were on. Most probably, if Apostol had used his strobe lights and landing lights on takeoff, as is usually done, the air traffic controllers would have been in a better position to follow the aircraft's flight path. We cannot find for plaintiffs based on this aspect of their case presentation.

Going to the cause of the accident, we find that pilot Nicholas Apostol stalled the aircraft upon takeoff and utilized improper recovery maneuvers. This was the direct and only cause of the accident. Upon arriving at the end of the runway, full-length takeoff was initiated. Apostol applied takeoff power. After rolling some 600 feet down the runway, the airplane rotated and took off at some 40 knots. The aircraft's stall speed in straight and level flight was around 39 knots. Since Apostol was cleared for a left turn on downwind takeoff westbound to Dorado, he initiated the left turn. The DW–16 rotated at more than a 45–degree angle of attack, and began to hover and gain altitude while banking to the left. The stall warning horn and light came on. Apostol realized that he was not in a flying configuration and then committed a grave error of judgment. In attempting to recover from a full-power stall, he pulled back on the power, rather than lowering the nose and bringing the aircraft to straight and level flight to gain speed and recover lifting power. His whole objective was to get the airplane back on the ground before he got any higher and, in executing the maneuver, he crashed some 1900 feet down the runway into the large, grassy area that exists between the left side of runway 7 and the Boca de Congrejos road running parallel to the Isla Verde beach.

The aircraft was finally located some 70 feet into the grass on the left side of the runway. The aircraft had impacted the ground with the right wing tip and nose of the fuselage and moved 50 feet in an easterly direction before coming to rest with the fuselage aligned on a southeasterly heading. This scenario is fully compatible with a stall achieved by attaining a very high angle of attack of 45 degrees and by further enhancing the stall configuration by the left bank or downwind left turn before having gained enough speed. The right wing lost lifting power and, thus, the aircraft, flying low at that moment, hit the ground, right wing first. The government cannot be blamed for Mr. Apostol's imprudence in piloting the aircraft.

### The Applicable Law

■ The leading case in this circuit on the subject of the applicable law in a case like the present one is *In re N–500L Cases*, 691 F.2d 15 (1st Cir.1982). We, therefore, restate the law as established by said case. Under the Federal Tort Claims Act, this case is governed by the substantive law of Puerto Rico, where the injury occurred. 28 U.S.C. Sec. 1346(b); *Richards v. United States*, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d

492 (1962). *See Bonn v. Puerto Rico International Airlines, Inc.*, 518 F.2d 89, 91 (1st Cir.1975). According to Puerto Rico law, a party is liable for the injuries caused by his negligent conduct if it is foreseeable that the conduct will cause injury. *Cruz Costales v. Commonwealth*, 89 P.R.R. 102, 106 (1963). A party's negligence is the legal cause of the harm suffered if the injury would not have occurred absent that party's negligent conduct. *Pabón Escabí v. Axtmayer*, 90 P.R.R. 20, 27 (1964). Moreover, it is not necessary that the conduct be the sole proximate cause of the injury as long as it is a proximate cause. *Widow of Andino v. W.R.A.*, 93 P.R.R. 168, 178 (1966). Although Dorado Wings, Inc. was a public carrier, here, the operation of DW–16 by Dorado Wings' President Nicholas Apostol, with company personnel, cannot be equated to the situation where fare-paying passengers are involved. Fare-paying passengers are entitled to the highest degree of care, *Muñoz v. New York & Porto Rico Steamship Co.*, 72 P.R.R. 543, 546 (1951). However, here, said particular standard is not of application, inasmuch as Dorado Wings is not a defendant and the flight was not a fare-paying ride.

■ The Federal Aviation Administration (FAA) has promulgated regulations (FARs) that govern, *inter alia*, the operation of airplanes by pilots. Pilots' "rules of the road" are found in Part 91 of Title 14 of the Code of Federal Regulations. These regulations have the force and effect of law, *Tilley v. United States*, 375 F.2d 678, 680 (4th Cir.1967); *United States v. Schultetus*, 277 F.2d 322, 327 (5th Cir.), *cert. denied*, 364 U.S. 828, 81 S.Ct. 67, 5 L.Ed.2d 56 (1960), and their violation is negligence *per se*. *Gatenby v. Altoona Aviation Corp.*, 407 F.2d 443, 446 (3d Cir.1968); *Insurance Co. of North America v. United States*, 527 F.Supp. 962, 967 (E.D.Ark. 1981). *See Ramos Oppenheimer v. Leduc*, 103 P.R.Dec. 342, 345 (1975).

In addition to the FARs, the FAA publishes the Airman's Information Manual, government's Exhibit B, in order to explain to pilots the application of the FARs in various situations. FAA Advisory Circulars are also promulgated on various topics to advise pilots of methods of avoiding certain hazardous conditions, such as Advisory Circular AC 90–23D (December 15, 1972), government's Exhibit A, dealing with wake turbulence. The Airman's Information Manual and the FAA Advisory Circulars are evidence of the standard of care among all pilots, *Muncie Aviation Corp. v. Party Doll Fleet, Inc.*, 519 F.2d 1178, 1180–81 (5th Cir.1975), and it is assumed that all pilots have read and know their provisions. *Associated Aviation Underwriters v. United States*, 462 F.Supp. 674, 680 (N.D.Tex.1979).

The Airman's Information Manual also contains information on wake turbulence and recommends procedures for avoiding it. Pilots are advised that air traffic controllers will warn a VFR aircraft of a wake turbulence hazard from a nearby plane but they are reminded, "WHETHER OR NOT A WARNING HAS BEEN GIVEN, HOWEVER, THE PILOT IS EXPECTED TO ADJUST HIS OPERATIONS AND FLIGHT PATH AS NECESSARY TO PRECLUDE SERIOUS WAKE ENCOUNTER." Manual at 175 (July 1981) (emphasis original). Because the vortices are generated from the moment the aircraft leave the ground, prior to takeoff pilots should note the rotation point of the preceding aircraft, especially if it is a heavy jet. Once noted, the light aircraft is to rotate prior to the rotation point of the large aircraft and continue to climb and stay upwind of the large aircraft climb path until turning clear of his wake. Manual at 174 and 176. *See also* Advisory Circular AC 90–23D, mentioned before, government's Exhibit A. When a pilot is operating under VFR, or clear weather conditions, he has the responsibility to see and avoid other aircraft. 14 C.F.R. Secs. 91.67(a). This responsibility extends beyond observing and staying away from other traffic; it requires vigilance with regard to wake turbulence as well. Pilots are instructed that "the flight disciplines necessary to assure vortex avoidance during VFR operations must be exercised by the pilot. Vortex visualization

and avoidance procedures should be exercised by the pilot using the same degree of concern as in collision avoidance." Manual, government's Exhibit B, at 176.

██ Although air traffic controllers may have responsibilities concurrent with those of the pilot in the terminal area, *see Delta Air Lines, Inc. v. United States,* 561 F.2d 381, 392 (1st Cir.1977), *cert. denied,* 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978), the primary responsibility for avoiding collision and wake turbulence in VFR conditions is with the pilot. *Miller v. United States,* 587 F.2d 991, 996 (9th Cir.1978); *Kack v. United States,* 570 F.2d 754, 756 (8th Cir.1978), *aff'g,* 432 F.Supp. 633 (D.Minn.1977); *Richardson v. United States,* 372 F.Supp. 921, 926–27 (N.D.Cal. 1974); *Wenninger v. United States,* 234 F.Supp. 499, 516–17 (D.Del.1964), *aff'd,* 352 F.2d 523 (3d Cir.1965). This is so regardless of whether a clearance has been given by the controller, *Kack,* 570 F.2d at 756, because the pilot generally is in the best position to see other aircraft around him and to visualize their vortex trails. *Richardson,* 372 F.Supp. at 927.

██ As found, wake turbulence did not play a part in this accident. The phenomenon had dissipated at the time DW–16 commenced its takeoff roll. Apostol was in the best position to visualize and avoid the wake turbulence. He had no impediment to achieve a safe takeoff. However, in so doing he stalled the aircraft. The air traffic controller acted in conformity with the Air Traffic Control Manual. The accident occurred because pilot/plaintiff Nicholas Apostol incurred in pilot error. The stall cannot be imputed to the defendant. There is no causal connection between the stall and government conduct through the air traffic controller. The pilot had the primary responsibility for the safety of the flight. Under the facts as found, the duty of the air traffic controller was not even concurrent with that of the pilot and definitely not preemptive of it. *See In re N–500L Cases,* 691 F.2d at 33.

**Judgment**

It is the court's determination that the complaints in the two consolidated cases be, and the same are hereby, DISMISSED.

IT IS SO ORDERED.

### ILLUSTRATION #1

### ILLUSTRATION #2